626 A.2d 434

PINE BELT CHEVROLET, INC., A NEW JERSEY CORPORATION, NICHOLAS B. SPORTELLI, M.D., AND JEAN C. SPORTELLI, HIS WIFE, PLAINTIFFS-RESPONDENTS, v. JERSEY CENTRAL POWER AND LIGHT COMPANY, A NEW JERSEY PUBLIC UTILITY, DEFENDANT-RESPONDENT, AND HAZEL F. GLUCK, COMMISSIONER OF THE DEPARTMENT OF TRANSPORTATION OF THE STATE OF NEW JERSEY, AND THE DEPARTMENT OF TRANSPORTATION OF THE STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS.

Argued November 10, 1992—Decided July 8, 1993.

*Susan R. Roop,* Deputy Attorney General, argued the cause for appellants (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel).

*James H. Laskey* argued the cause for respondent Jersey Central Power and Light Company (*Norris, McLaughlin & Marcus,* attorneys; *Mr. Laskey* and *Walter G. Reinhard,* of counsel and on the brief).

*Dominic J. Aprile* argued the cause for respondents Pine Belt Chevrolet, Inc., and Sportellis (*Bathgate, Wegener, Dugan, Wouters, Neumann & Wolf,* attorneys).

*Richard B. McGlynn* submitted a letter in lieu of brief on behalf of *amicus curiae,* New Jersey Utilities Association (*LeBoeuf, Lamb, Leib & MacRae,* attorneys).

CLIFFORD, J.

This appeal raises an issue of statutory interpretation. Under the common law a utility company is required to pay the costs of relocating a utility facility when the relocation is required because of highway construction that furthers the public interest. A section of the Act, *N.J.S.A.* 27:7–44.9, shifts those costs to the State Department of Transportation (DOT) for relocations necessitated by highway projects.

We granted certification, 130 *N.J.* 10, 611 *A.*2d 649 (1992), to review the Appellate Division's determination that DOT, rather than the utility company or private-property owners, should pay the costs of relocating utility facilities when DOT requires a road-widening as a condition for granting a highway-access permit. We reverse the judgment of the Appellate Division and now hold that *N.J.S.A.* 27:7–44.9 shifts relocation costs in only those circumstances in which DOT both administers and contracts for the project and pays all or part of the costs thereof. Absent those conditions, the common-law rule applies and the utility company must bear the costs of relocations necessitated by highway construction ordered by DOT in furtherance of the public interest. On this appeal no party seeks to change that common-law rule; the argument is over the extent to which the Legislature has abrogated the rule.

## I

Plaintiff Pine Belt Chevrolet, Inc. (Pine Belt) owns property adjacent to Route 88, a State highway, in Lakewood. Plaintiffs Nicholas and Jean Sportelli own property adjacent to the same highway in Bricktown. Plaintiffs began developing their properties in 1985 and 1986: Pine Belt built an automobile sales and service center and the Sportellis built a private residence and medical office. Each applied to DOT for permits and approvals to gain access to Route 88. See *N.J.S.A.* 27:7–44.1.

In accordance with its policy of conditioning access permits on compliance with the design guidelines set out in its *Design Manual—Roadway (Design Manual)*, DOT notified plaintiffs that permits would be issued only if the curb lines abutting their respective properties were set back twenty-two feet from the centerline of Route 88. The *Design Manual* indicates the desirability of twelve-foot roadway lanes and ten-foot shoulders. DOT also informed plaintiffs that the utility poles, owned by Jersey Central Power & Light Company (JCP & L), located along their frontages would have to be relocated behind the new curb line. DOT made no determination concerning who should shoulder the costs of those relocations. Plaintiffs submitted plans consistent with DOT's directives, and DOT issued the permits.

When the Sportellis began construction, they notified JCP & L of the need to relocate the utility poles. JCP & L refused to relocate the poles unless the Sportellis paid for the relocation. The Sportellis refused to pay but continued with the road-widening and the other work on their property. At the time the Sportellis submitted their brief to this Court, the poles remained on the roadway side of the relocated curb line.

Pine Belt too refused to pay JCP & L for the relocation costs. At JCP & L's behest DOT intervened and instructed Pine Belt to reach an agreement with JCP & L within thirty days or suffer revocation of its access permit. Pine Belt reached an agreement with JCP & L and deposited $34,866.25 with the

utility, $19,107.73 of which was refunded after the relocation. Pine Belt did so without waiving its right to challenge DOT's action and JCP & L's refusal to pay the relocation costs.

Plaintiffs filed a Complaint against JCP & L, DOT, and Hazel Gluck, the former Commissioner of DOT, seeking a declaratory judgment that plaintiffs were not responsible for the utility-relocation costs. JCP & L filed an Answer, Counterclaim, and Crossclaim, denying financial responsibility and claiming that plaintiffs or DOT should pay. DOT filed an Answer and a Counterclaim. All parties then moved for summary judgment.

Before the trial court, JCP & L argued that *N.J.S.A.* 27:7–44.9 controlled the disposition of the case. That statute provides in pertinent part:

> a. In addition to other powers conferred upon the Commissioner of Transportation by any other law and not in limitation thereof, the commissioner, in connection with the construction, reconstruction, maintenance or operation of any highway project, may make reasonable regulations for the installation, construction, maintenance, repair, renewal, relocation and removal of pipes, mains, conduits, cables, wires, towers, poles and other equipment and appliances, herein called "facilities," of any public utility * * * in, on, along, over or under any *highway project*. Whenever the commissioner determines that it is necessary that [utility] facilities which now are, or hereafter may be, located in, on, along, over or under any *highway project* shall be relocated in the project or should be removed from the project, the public utility * * * company owning or operating the facilities shall relocate or remove the same in accordance with the order of the commissioner. *The cost and expenses of such relocation or removal * * * shall be ascertained and paid by the commissioner as a part of the cost of the project.* * * *
>
> b. As used in this act, *"highway project," in addition to its ordinary meaning means one which is administered and contracted for by the commissioner.* (emphasis added.)

JCP & L read that statute as requiring DOT to pay the relocation costs because the required road widening fell within the ordinary meaning of "highway project"—an ordinary meaning that, according to the utility, was expanded by the "administered and contracted for" language of subsection b. JCP & L interpreted the statute as abrogating completely the common law, which required the utility to pay for relocations necessitated by highway constructions furthering the public interest. Under JCP & L's view DOT is liable for relocation costs

whether it performs a project itself or requests someone else to perform. In short, a utility should pay for only those relocations undertaken on its own initiative.

DOT argued that the "highway project[s]" to which the statute applies are limited by the "administered and contracted for" phrase contained therein. DOT claims that it must bear relocation costs only when the State both administers and contracts for the project such that relocation costs are includable in the overall project cost.

Plaintiffs argued that DOT was implementing a highway project and that allowing it to evade payment of relocation costs would circumvent the purpose of the statute. Alternatively, plaintiffs argued that if the statute did not apply, the common law required the utility to pay because the road-widening benefitted the public.

The trial court granted plaintiffs' and DOT's motions for summary judgment and denied JCP & L's motion. The court held that *N.J.S.A.* 27:7–44.9 did not require DOT to absorb the cost of relocating the utility poles. The trial court found no other statute assigning the cost to DOT, and therefore applied the common-law rule requiring the utility to bear the costs of utility relocations necessitated by road construction furthering the public interest.

In holding that *N.J.S.A.* 27:7–44.9 did not require the Commissioner to pay the relocation costs, the trial court noted: "[T]he commissioner did not order the utility to relocate the poles. More importantly, this was not a project administered and contracted for by the commissioner." The trial court read "administered and contracted for" to limit the definition of "highway project" and hence the applicability of the statute to only those projects for which the Commissioner directly administers and contracts. To hold otherwise, reasoned the trial court, would render meaningless that language in the statute directing DOT to absorb relocation costs "as a part of the cost

of the project." *N.J.S.A.* 27:7–44.9(a). The trial court also supported its decision by citing the statute's legislative history.

Finding the statute inapplicable and DOT not liable, the trial court then considered whether plaintiffs or JCP & L should pay the relocation costs. The court found that the road-widening furthered the public welfare and that the relocation of the utility poles was, therefore, for the public good and not solely for the benefit of the property owners. That being the case, the common law, as explicated in *Port Authority v. Hackensack Water Co.*, 41 *N.J.* 90, 195 *A.*2d 1 (1963), and *Fellowship Bank v. Public Service Electric & Gas Co.*, 158 *N.J.Super.* 107, 385 *A.*2d 887 (App.Div.), *certif. denied*, 77 *N.J.* 503, 391 *A.*2d 516 (1978), required JCP & L to bear the relocation costs.

The Appellate Division reversed, 249 *N.J.Super.* 461, 592 *A.*2d 634 (1991). In assigning relocation costs to DOT, the court rejected the trial court's narrow reading of the statute. *Id.* at 473, 592 *A.*2d 634. The Appellate Division found the definition of "highway project" in subsection (b) to be an expansive one that included projects administered *or* contracted for by the Commissioner. *Id.* at 474, 592 *A.*2d 634. If one reads the statutory phrases disjunctively, *N.J.S.A.* 27:7–44.9 would include within its scope projects administered by DOT but not contracted out as well as projects for the completion of which DOT contracts with agencies, political subdivisions, or private entities. Such a definition, according to the Appellate Division, would encompass the current case, in which the grant of an access permit was conditioned on the performance of an improvement conforming to DOT's design guidelines.

The Appellate Division pointed out that when relocation is necessitated by an improvement such as an acceleration or deceleration lane required by an increase in traffic resulting from a commercial or housing development, the development as the primary beneficiary would be required to underwrite the costs. *Id.* at 472–73, 592 *A.*2d 634. Similarly, if the relocation is brought about as part of the utility's efforts to improve or

expand service, the utility should bear the costs. *Id.* at 473, 592 *A.*2d 634. Concluding that the Legislature had intended to change the common-law rule with regard to the allocation of utility-relocation costs, the court stated:

> In enacting *N.J.S.A.* 27:7-44.9, the legislature has found it more appropriate that DOT undertake obligations for public utility relocation costs incurred in connection with highway improvements rather than to charge the utility for those costs. Under this policy, when DOT pays, the monies ultimately come from the beneficiaries of the highway improvements, *i.e.,* the motoring public through other sources such as federal or state public funds or gasoline taxes. On the other hand, when the utility pays, the costs are ultimately borne by the utility rate payers, including the non-motoring public and low income tax payers, even though the highway improvement does nothing to improve utility service.

> [*Id.* at 474–75, 592 *A.*2d 634.]

The Appellate Division further noted the policy consideration that relocation expenses are more efficiently budgeted for within DOT than by utility companies, which cannot foresee the extent of facility relocations. *Id.* at 469, 592 *A.*2d 634.

The specific issue posed in this Court is whether DOT's imposition of conditions on access permits that require the permittee to widen the road and as a consequence to relocate utility poles amounts to a "highway project" under *N.J.S.A.* 27:7-44.9—a conclusion that would trigger that statute and shift relocation costs to DOT.

JCP & L argues that because DOT imposed the widening condition on seventy-four permits for access to Route 88, DOT had a long-range plan to widen the road, and that plan, although not physically or financially implemented by DOT, was a "highway project." DOT denies responsibility for relocation costs, arguing that *N.J.S.A.* 27:7-44.9 directs DOT to include the costs of relocation in the project cost only when DOT has control of all components and costs of a highway project. It claims that when a private-property owner is responsible for the construction and DOT's only involvement is issuing the permit, the common law should apply, placing the financial liability for relocation costs on the utility when the relocation

benefits the public. Plaintiffs argue, not surprisingly, that the Appellate Division is correct and in the alternative that the trial court is correct—in either case they are not liable for the relocation costs.

## II

Prior to the enactment of *N.J.S.A.* 27:7–44.9, the common law assigned utility-relocation costs to the utility company when the project necessitating the relocation benefitted the public. For example, in *Port Authority, supra,* 41 *N.J.* at 97–98, 195 *A.*2d 1, we assigned relocation costs to the utility company when the Port Authority made improvements to its structures that benefitted the public and required utility relocation. *Cf. In re Petition of Cinnaminson Properties, Inc. v. Public Serv. Elec. and Gas Co.,* New Jersey Board of Public Utilities, Docket No. 736–431 (1974) (holding that when primary beneficiary of project is private property owner or developer, common law assigns utility-relocation costs to that owner or developer). In doing so this Court reasoned that a utility

is permitted to use the public way because it serves a public interest, but since its venture is for gain and since in any event the primary purpose of the public easement is the public's own use of it, the utility's interest in the public way is subordinate to the public's enjoyment of it. Hence the utility runs the risk that the public welfare may require changes in the road which will call for relocation of its facilities.

[*Id.* at 96–97, 195 *A.*2d 1.]

Similarly, utility companies have been forced to pay relocation costs when the project was performed by a private entity acting in the public interest. For example, in *Fellowship Bank, supra,* 158 *N.J.Super.* 107, 385 *A.*2d 887, a bank sought approval of its site plan to build an office on property abutting Church Road, a county road. Approval of the bank's plan was conditioned on its dedication of a right-of-way to permit the widening of the road—a condition consistent with the county's master plan and imposed in the past on other Church Road property owners seeking site-plan approval. The dedication and resul-

tant road-widening required the relocation of the utility's facilities. The Appellate Division noted "as dispositive the fact of the immutability of the county in its intention that Church Road ultimately be 86 feet wide, in accordance with the master plan." *Id.* at 110, 385 *A.*2d 887. The court concluded that that intention reflected a determination by the county that the public welfare required the change in the road. Because the relocation was in the public interest and not merely the parochial interest of the private-property owner, the utility company was liable for relocation costs. Citing *Port Authority, supra,* 41 *N.J.* 90, 195 *A.*2d 1, the court said: "[T]his is the price the utility company must pay for the privilege of location within a public right of way when the public welfare requires changes in the road which call for a relocation of facilities." 158 *N.J.Super.* at 111, 385 *A.*2d 887.

In *Port Authority* we cited several statutes relating to the allocation of costs associated with utility-facility relocation, noting that the Legislature had, on prior occasions, acted selectively in reassigning such costs in derogation of the common law. See 41 *N.J.* at 107–08, 195 *A.*2d 1. Thus, we recognized that any decision to overturn the common law on costs-allocation in this area should be left to the Legislature. *Id.* at 108, 195 *A.*2d 1.

In 1983 the Legislature enacted *N.J.S.A.* 27:7–44.9. The Statement of the Assembly Revenue, Finance and Appropriations Committee accompanying the bill makes clear the Legislature's intent to shift the cost of utility relocations necessitated by road improvements benefitting the public away from the utility company, where it had reposed under the common law. The Committee stated:

> [Currently], the expense of utility relocations for land service road improvements are financed through the utility's rate structure and are ultimately paid by the utility's rate payers. Enactment of this legislation recognizes the cost of utility relocation as a component of the total cost of highway improvement. These costs should not be paid by the utility rate payer who is already burdened with escalating prices associated with the increased cost of energy, but should

come from the same broad State and federal tax base which provides for the highway improvement.

A Fiscal Impact statement accompanying the Committee Statement reveals that "[t]he principle behind this bill is to shift utility relocation costs from utility rate payers to highway project costs."

Although *N.J.S.A.* 27:7–44.9 clearly abrogates the common law, we do not believe that the Legislature intended the abrogation to be complete. A determination of the extent of the abrogation intended depends on an analysis of the statutory language and legislative history.

A

Our task is to determine the meaning of "highway project" as that term is used in *N.J.S.A.* 27:7–44.9. We reiterate that the statute provides that " 'highway project,' in addition to its ordinary meaning, means one which is administered and contracted for by the commissioner."

When considering the ordinary meaning of "highway project," the Appellate Division determined that "there can be no dispute that widening Route 88 is in keeping with a long-range design or plan for highway improvement and is a highway project within the ordinary meaning of that term." 249 *N.J.Super.* at 471, 592 *A.*2d 634. That court's conclusion was based on the fact that in accordance with its *Design Manual,* DOT has conditioned all access permits on Route 88—seventy-four between 1985 and 1988—on the permittee's widening of that road to twenty-two feet from the center line. The Appellate Division viewed the consistency of the application of that permit condition as the execution of DOT's long-range road-widening project for Route 88. It reasoned that "[o]therwise it would be nonsensical to require in piecemeal fashion that a curb line be installed 22 feet from the center line of Route 88 and that utility poles be relocated." *Id.* at 472, 592 *A.*2d 634.

The *Design Manual*, a general document applicable to all roadways within DOT's jurisdiction, provides "a means of developing uniformity and safety in the design and plan preparation of a highway system consistent with the needs of the motoring public." It serves as a guide and provides technical assistance for the highway designer. It is not a set "blueprint" for a specific construction project. The introductory section of the *Design Manual* recognizes that "situations will occur where good engineering judgment dictates deviations from the current Department design policy."

The road-widening condition on plaintiffs' access permits is consistent with that document. For example, § 5–03 states that lane widths of twelve feet are desirable, while § 5–04.2 recommends ten-foot-wide shoulders. John Potapa, supervising engineer in the Office of Regional Design, testified on oral deposition that the twenty-two-foot widening condition applied to all two-lane roadways. DOT admitted in its response to an interrogatory that the twenty-two-foot road-widening condition placed on plaintiffs' access permits came from the *Design Manual*.

The Appellate Division's conclusion that the road-widening condition would be nonsensical absent a long-range plan, 249 *N.J.Super.* at 472, 592 *A.*2d 634, ignores DOT's attempts at safety-conscious design consistency. The *Design Manual* notes that lane widths greatly influence the safety and comfort of driving, and that shoulder widths of ten feet minimum allow a stopped or emergency vehicle to clear the pavement edge by at least one foot. A ten-foot-wide shoulder also provides lateral support for subbase, base, and surface courses of the roadway.

In his deposition Eugene Shoup, the acting regional maintenance engineer for Region III of DOT—the office responsible for maintaining Route 88, issuing access permits, and monitoring construction relating to those permits—testified that in his opinion the purpose of the *Design Manual* "would be so everybody is working in the same direction as far as design

standardization." Shoup testified further that when reviewing any type of permit applications or when any improvements are made along Route 88, the design office would indicate that the width of the road should be twenty-two feet from the center line. Stephen Witkowski, a principal DOT transportation engineer and former engineer of permits for Region III at the time plaintiffs made application, testified in his deposition that the design office also required dimension revisions on roadways other than Route 88, such as certain sections of Routes 9, 71, and 36. Mr. Potapa testified that the twenty-two-foot widening condition also applied to sections of Routes 70 and 37 in Ocean County.

The Shoup and Witkowski testimony bolsters DOT's claims that no long-term plan or project to widen Route 88 existed. In requiring compliance with the design guidelines, DOT was merely acting within its authority to ensure the safety of State roads. Further supporting our conclusion is the fact that in January 1988, DOT undertook a feasibility study on potential improvements to Route 88, which ultimately recommended that "a full widening will not be required until some years beyond the Year 2007." Shoup, Witkowski, and Potapa testified that they were not aware of any plan or design project to widen Route 88 or to make it a multi-lane highway. According to Potapa, sections of Route 88 unaffected by access permits would not be widened. Hence, had plaintiffs not sought access permits, DOT would not have widened Route 88 along their frontages. We therefore disagree with the Appellate Division that DOT's conditioning of access permits on the permittee's widening of Route 88 to twenty-two feet was a "highway project."

We conclude that when read in the context of *N.J.S.A.* 27:7–44.9, the definition of "highway project" is limited to only those projects "administered and contracted for by the commissioner." The Appellate Division found that the phrase "in addition to its ordinary meaning" expands the meaning of "highway project," and that "administered and contracted for" should be

read disjunctively so that the statute applies to those projects administered *or* contracted for by DOT. 249 *N.J.Super.* at 473–74, 592 *A.*2d 634. An analysis of the administrative regulations in Chapter 25 of Title 16 of the New Jersey Administrative Code (promulgated to implement *N.J.S.A.* 27:7–44.9), the plain meaning of the statute, and the legislative history all serve to undermine the Appellate Division's determination.

The regulations in *N.J.A.C.* 16:25–1.1 to –13.1 apply generally to utilities located, adjusted, or relocated within rights-of-way under the auspices of DOT. *N.J.A.C.* 16:25–1.3. The Appellate Division supported its expansive reading of *N.J.S.A.* 27:7–44.9 by relying in part on *N.J.A.C.* 16:25–10.10, which sets out a utility's responsibility for costs in respect of facility relocations, adjustments, installations, maintenance, and the like. Subsection (f) of that regulation states that "[i]f any subsequent change in the highway facility necessitates the moving or adjusting of utility facilities * * * then the Department shall bear all costs and expenses of such required move or adjustment." The court also cites *N.J.A.C.* 16:25–12.1, which sets forth the utility owners' eligibility for reimbursement and procedures for reimbursing them for the costs of relocations and adjustments required by "highway construction or improvements."

However, the Appellate Division's conclusion that those regulations "mandate that in situations where DOT requires relocation of utility lines, payment is to be made by DOT[,]" 249 *N.J.Super.* at 470, 592 *A.*2d 634, is refuted by other parts of those same regulations. For example, *N.J.A.C.* 16:25–10.10(g) states that "[t]he utility shall begin such move or adjustment following written notice and request to do so by the Department, and shall * * * [not cause] undue delay to, or interference with, highway construction, betterment or maintenance operations." That section reveals that the relocation contemplated by *N.J.A.C.* 16:25–10.10(f) is one directly ordered by DOT, such as occurs when DOT itself contracts and pays to build, improve, or repair a road, rather than a relocation occa-

sioned by highway construction paid for by a private-property owner at the behest of DOT. We note that when DOT itself contracts for highway improvements, the contractor neither orders the utility to relocate facilities nor enters into an agreement with the utility company; rather, DOT enters into a separate agreement with the utility company providing for both the relocation and the means of reimbursement. Because in the present case plaintiffs, not DOT, requested JCP & L to move the poles, we reject the applicability of *N.J.A.C.* 16:25–10.10

*N.J.A.C.* 16:25–12.1(c) further suggests that *N.J.A.C.* 16:25–10.10 and *N.J.A.C.* 16:25–12.1 are not generally applicable to the present case as determined by the Appellate Division. After setting forth general criteria for reimbursement of relocation costs, *N.J.A.C.* 16:25–12.1(c) states that "[t]he general criteria * * * shall apply in determining eligibility for reimbursement for the relocation of utilities on any construction or improvement project administered (constructed) by the Department * * *." That regulation appears to contemplate reimbursement only when DOT directly constructs or directly administers a contract to construct a project—again, not the situation in this case.

■ The plain meaning of the phrase "administered and contracted for" is conjunctive. We note that "[t]he word 'and' carries with it natural conjunctive import while the word 'or' carries with it natural disjunctive import." *State v. Duva*, 192 *N.J.Super.* 418, 421, 470 *A.*2d 53 (Law Div.1983). Furthermore, "the legislature is deemed to have intended what it wrote and the Court may not construe a contrary concept." *Ibid.* We have, however, recognized that "[t]he words 'or' and 'and' are ofttimes used interchangeably, and the determination of whether the word 'and' as used in a statute should be read in the conjunctive or disjunctive depends primarily upon the legislative intent." *Howard v. Harwood's Restaurant Co.*, 25 *N.J.* 72, 88, 135 *A.*2d 161 (1957).

The language surrounding the disputed portion of the statute does not evince any intention to create a disjunctive meaning. *See Duva, supra,* 192 *N.J.Super.* at 421, 470 *A.*2d 53. Although the focus in this case is on one part of *N.J.S.A.* 27:7–44.9, all parts of the statute must be read together so that each part is consistent with the whole. *Febbi v. Division of Employment Sec.,* 35 *N.J.* 601, 606, 174 *A.*2d 481 (1961). We perceive that the only way to give meaning to each clause of *N.J.S.A.* 27:7–44.9 is to recognize that the phrase "administered and contracted for" limits the ordinary meaning of "highway project" despite the presence of the phrase "in addition to its ordinary meaning."

Specifically, *N.J.S.A.* 27:7–44.9(a) states that "[t]he cost and expenses of such relocation * * * shall be ascertained and paid by the commissioner as a *part of the cost of the project.*" (Emphasis added.) That language suggests that the Legislature intended that DOT pay the costs associated with relocation only when DOT was also responsible for payment of all or some portion of the costs of the highway construction. Logically, if the Commissioner bears no cost, the cost of relocation cannot be part of the cost of the project. (We reiterate that in this case, the permittee, not the Commissioner, is responsible for all road-widening costs.) Applying the statute to situations in which the Commissioner is not responsible for the cost of the highway project would render meaningless the emphasized portion of the above-quoted language of subsection (a). We therefore reject such a construction in favor of one that will make the entire statute effective. *See State v. Reynolds,* 124 *N.J.* 559, 564, 592 *A.*2d 194 (1991) (holding that "[a] construction that will render any part of a statute inoperative, superfluous, or meaningless, is to be avoided"); *Hoffman v. Hock,* 8 *N.J.* 397, 406–07, 86 *A.*2d 121; 2A *Sutherland on Statutory Construction* § 46.06 (5th ed. 1992). Therefore, in light of what we believe to be the full import of *N.J.S.A.* 27:7–44.9(a), we conclude that the words "in addition to" cannot have been meant by the Legislature to expand the meaning of "highway

project" as determined by the Appellate Division. *See* 2A *Sutherland on Statutory Construction* § 46.06 (5th ed. 1992) (noting that "words and clauses * * * present in a statute only through inadvertence can be disregarded if they are repugnant to what is found on the basis of other indicia, to be the legislative intent").

Our conclusion that "administered and contracted for" limits, rather than expands, the ordinary meaning of "highway project" is buttressed by the legislative history of *N.J.S.A.* 27:7–44.9. Nothing in that history supports a disjunctive reading of "administered and contracted for." Nor does a conjunctive reading conflict with any legislative intent. Like the statute itself, the Senate and Assembly Revenue, Finance and Appropriations Committees' Statements as well as the Fiscal Note to the bill authorize the DOT Commissioner "to include the costs associated with the relocation of utility facilities in the overall cost of a highway project when the project is administered and contracted for by the department." (Similarly, an Executive Office Inter–Communication from Chief Counsel W. Cary Edwards to Governor Thomas H. Kean (hereinafter Counsel's Communication) describes the bill as authorizing DOT to "include the costs associated with relocation of utility facilities * * * in the overall cost of any highway project administered and contracted by DOT.") DOT cannot include relocation costs in overall project costs when, as in this case, a private-property owner rather than DOT is liable for those project costs. Furthermore, the phrase "when the project is administered and contracted for" indicates most clearly that the Legislature intended to narrow the definition of "highway project" and consequently to limit the application of *N.J.S.A.* 27:7–44.9, because that phrase recognizes that some projects would not be both administered and contracted for by DOT. The costs of relocation in those projects would be allocated according to the common-law rule.

The Assembly Committee Statement declares that "[t]he bill gives the department complete control of all components and

costs of those projects" to "reduce the overall cost of highway improvements by permitting more effective and efficient project management and engineering." Furthermore, the Committee stated that "[e]nactment of this legislation recognizes the cost of utility relocation as a component of the total cost of highway improvement." By consistently treating utility-relocation costs as a component of the total cost of highway improvement, the Legislature obviously intended *N.J.S.A.* 27:7–44.9 to shift those costs only in situations in which DOT, not the private-property owner, was liable for the costs of the highway project. In this case DOT did not have the sweeping fiscal responsibility and control contemplated by the above-quoted language; rather, plaintiffs had control of all components of the improvement (albeit in accord with DOT's design guidelines). The statute is simply not applicable. The common law apportions costs among the utility and the property owner.

Furthermore, the Fiscal Note to the bill provides estimates of the increased costs to the State for the three fiscal years following its passage. Those projections were "based on contract awards of approximately $150 million per year." The use of contract awards as a basis for estimating the fiscal impact of the bill supports the theory that the statute was intended to apply only to projects for which DOT assumes financial responsibility and over which it retains control.

Perhaps most telling is the Assembly Committee's remark regarding the costs of relocation: "These costs * * * should come from the same broad State and Federal Tax base which provides for the highway improvement." That statement clearly supports the conclusion that when it drafted *N.J.S.A.* 27:7–44.9, the Legislature had in mind those projects funded by DOT through tax proceeds, not projects paid for by private-property owners.

We conclude that the mention of the "Federal Tax base" in the Committee's Statement indicates strongly that the Legislature's enactment of *N.J.S.A.* 27:7–44.9 was in part motivated by

the availability of federal reimbursement for highway projects. Further evidence of that motivation appears in the Assembly Committee's Statement that the statute will "enable the State to participate in additional federal assistance for safety programs involving relocation of utility facilities." Likewise, Counsel's Communication states that DOT supported the bill in part because "most of the costs will be eligible for federal reimbursement." Read together with the language allowing DOT to lump relocation costs into overall project cost, those references to the federal tax base and federal reimbursement lead to the conclusion that the Legislature and DOT envisioned *N.J.S.A.* 27:7–44.9 applying only in situations in which DOT pays for all or part of the costs of the underlying highway project and can thus at least potentially be eligible for federal highway funds.

We are therefore satisfied that "administered and contracted for" was intended to limit the scope of the statute to those projects initiated and paid for by DOT, and not to apply to the present situation, in which a private-property owner contracts and pays for a road improvement that benefits the public interest in order to satisfy a condition on a DOT driveway-access permit. In short, *N.J.S.A.* 27:7–44.9 works only a partial abrogation of the common-law doctrine.

### B

Under the Appellate Division decision, DOT would have to pay utility-relocation costs not only when it initiates and funds highway-construction projects but also when it orders private-property owners to undertake highway improvements that further the public interest and require utility relocations. Such a decision runs the risk of thwarting the proper exercise of DOT's police powers to order property owners to undertake highway-safety improvements in the public interest.

The lower court's decision has an even broader fiscal impact when considered in light of the "State Highway Access Man-

agement Code," *N.J.A.C.* 16:47–1.1 to –9.1 (Access Code), which became fully operative on September 21, 1992. *See* 2B *Sutherland on Statutory Construction* § 49.01 (5th ed. 1992) (stating that circumstances and situations developing after enactment of statute may have great or even conclusive significance in determining meaning conveyed). The enabling authority for the Access Code is the "State Highway Access Management Act," *N.J.S.A.* 27:7–89 to –98 (Access Act). That Act required the Commissioner of DOT to adopt a highway-access-management code that would provide a statutory and regulatory framework for managing access to State highways. The statute directs that the Access Code, among other things, develop a classification system for all State highways and set standards for the geometric design of all driveways, intersections, and interchanges. See *N.J.S.A.* 27:7–91b and c; Assembly Appropriations Committee Statement to Senate No. 772 (1988). The Access Act mandates that "[a]ny person seeking to construct or open a driveway or public street or highway entering into a State highway shall first obtain an access permit from the commissioner." *N.J.S.A.* 27:7–92a. DOT is granted broad power to include in access permits "whatever terms and conditions the commissioner finds necessary and convenient for effectuating the purposes of * * * [the] act." *N.J.S.A.* 27:7–92d. The Access Code sets forth a complex and comprehensive body of access standards and a detailed description of the permit process. See *N.J.A.C.* 16:47–3.1 to –4.41.

Were we to adopt the Appellate Division's conclusion that any road construction directed by DOT, whether administered or contracted for by the Commissioner or required as a condition on an access permit, is a highway project under *N.J.S.A.* 27:7–44.9, the cost of utility relocations necessitated by a permittee's compliance with certain DOT requirements under the Access Code would be borne by that agency. We read the "Fairshare financial contributions" regulation in the Access Code, *N.J.A.C.* 16:47–4.34(a), as anticipating situations in which DOT will pay all or part of the costs of highway improvements

such as road widenings, and therefore fall within *N.J.S.A.* 27:7–44.9. Conversely, situations may arise in which private-property owners will assume all costs of highway improvements, such as acceleration lanes at an access point, that are solely for their benefit. See *N.J.A.C.* 16:47–4.34(b). In that latter situation the private-property owner would bear relocation costs. Our interpretation of *N.J.S.A.* 27:7–44.9 leaves room for situations in which DOT will not automatically be liable for relocation costs whenever it orders compliance with the Access Code.

The Fiscal Note to the Access Act describes the anticipated costs of administering the bill. Those costs include consultant services to help develop site-specific plans and increased staff to review, *e.g.,* highway-access-permit requests, highway-classification changes, and access plans. The Fiscal Note further states that more accurate estimates of future State costs would be available following actual experience with the amount of additional work generated by the Access Code. That note suggests that the costs DOT envisioned as flowing from implementation of the Access Code were associated with increased administrative burdens rather than with large construction and utility-relocation costs. The Fiscal Note and other legislative history is conspicuously silent in respect of utility-relocation and DOT construction costs.

## C

In sum, we hold that under *N.J.S.A.* 27:7–44.9, the burden of paying utility-relocation costs falls on DOT when that agency has control of and responsibility for the components and costs of a highway project—*i.e.,* when DOT both administers and contracts for a highway project. Conversely, when relocation costs are incurred in conjunction with a highway project constructed and funded by an entity other than DOT, they fall on the utility or the developer according to common-law doctrines.

We were informed at oral argument that "traditionally" DOT has imposed on the property owner, as a condition of the granting of an access permit, the costs of relocating utility facilities. As authority for that practice DOT has relied on *N.J.S.A.* 27:7–44.1 ("No * * * person [shall] enter upon or construct any works in or upon any State highway, except under such conditions and regulations as the commissioner may prescribe * * *.") and of *N.J.S.A.* 27:7–91(h), a part of the State Highway Access Management Act, *N.J.S.A.* 27:7–89 to –98. That practice not having been followed here, no party challenges it and we have no occasion to consider DOT's authority to burden the property owner in that manner. Specifically, we imply no view on whether *N.J.S.A.* 27:7–44.1 transfers to the property owner the utility's common-law liability to pay the cost of relocating utility facilities.

### III

We find unpersuasive the argument by *amicus curiae*, New Jersey Utilities Association (NJUA), that the vast number of utility facilities prevents utility companies from budgeting for the relocation costs, and that if utilities must bear the relocation costs,

each permittee will have to "arrange" for utility relocation directly with the affected utility or utilities on a case by case basis. Therefore, each affected utility * * * will appropriately attribute the cost of relocation to the permittee, in accordance with its own internal rules and regulations.

Those costs, argues NJUA, rest more appropriately with DOT. The Appellate Division also reached that conclusion.

The rule in *Port Authority, supra,* 41 *N.J.* 90, 195 *A.*2d 1, was changed by *N.J.S.A.* 27:7–44.9 in respect of only those DOT "highway projects" that are "administered and contracted for" by DOT. Financial liability for improvements in furtherance of the public welfare but not administered and contracted for by DOT remains with the utility. *See Fellowship Bank, supra,* 158 *N.J.Super.* 107, 385 *A.*2d 887. The utilities may not, by their own rules and regulations, overturn the law.

 Finally, plaintiffs correctly argue that both the statute and the common law relieve private-property owners of financial liability when the relocation of utility facilities is mandated by the public welfare. *Port Authority, supra,* 41 *N.J.* at 96–97, 195 *A.*2d 1; *Fellowship Bank, supra,* 158 *N.J.Super.* at 110–11, 385 *A.*2d 887. We agree with the trial court that the road-widening condition imposed by DOT on plaintiffs' access permits primarily benefitted the public, not plaintiffs. We view the imposition of that condition as a permissible exercise of DOT's police powers to improve the safety of Route 88 and thereby further the public welfare.

That conclusion finds further support in the *Design Manual,* the genesis of the road-widening condition, which established the lane and shoulder widths to further the needs of the motoring public and improve highway safety. Additionally, the Access Code includes in its list of those improvements that "benefit only the applicant" acceleration and deceleration lanes, left-turn slots providing access to applicants' driveways, and traffic signals located at applicants' driveways. *N.J.A.C.* 16:47–4.34(b). Conversely, road widenings are classified as "capacity improvements * * * necessitated by traffic attributable to the development * * *." *N.J.A.C.* 16:47–4.34(a). DOT may require developers to pay their "fair share" of the cost of such capacity improvements in conjunction with DOT, or the agency may mandate that the developer pay the entire cost. *Ibid.* Thus, the Access Code does not treat a simple road widening at a highway-access point as an improvement benefitting only the private-property owner but rather as one that can, in the main, benefit the motoring public.

Thus, under the common law plaintiffs are relieved of paying relocation costs. *See Port Auth., supra,* 41 *N.J.* at 96–97, 195 *A.*2d 1; *Fellowship Bank, supra,* 158 *N.J.Super.* at 111, 385 *A.*2d 887. Liability for the costs of relocations necessitated by highway improvements that further the public welfare is a risk the utility companies run and a price they must pay for the privilege of locating within a public right-of-way.

## IV

Judgment reversed; the judgment of the Law Division is reinstated.

*For reversal and reinstatement*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7, join in this opinion.

*Opposed*—None.