985 A.2d 649 (2009)
411 N.J. Super. 244
In the Matter of CENTEX HOMES, LLC Petition for Extension of Service and/or for Exemption from Main Extension Rules N.J.A.C. 14:3-8.1 et seq. Pursuant to N.J.S.A. 48:2-27 and N.J.A.C. 14:3-8.8(A)(4) or (a)(6).
No. A-2207-07T3
Superior Court of New Jersey, Appellate Division.
Argued March 5, 2009.
Decided December 30, 2009.
*650 Kevin J. Coakley, Roseland, argued the cause for appellant Centex Homes, LLC (Connell Foley LLP, attorneys; Mr. Coakley, of counsel and on the brief; Joseph A. Villani, Jr., on the brief).
Geoffrey R. Gersten, Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (Anne Milgram, Attorney General, attorney; Sharon M. Joyce, Assistant Attorney General, of counsel; Mr. Gersten, on the brief).
Before Judges CARCHMAN, R.B. COLEMAN and SABATINO.
The opinion of the court was delivered by
R.B. COLEMAN, J.A.D.
Centex Homes, LLC (Centex) appeals a November 30, 2007 order of the New Jersey Board of Public Utilities (the BPU or the Board), denying Centex's petition for an order directing various public utilities to pay for or contribute to the cost of service extensions pursuant to N.J.S.A. 48:2-27. The BPU denied the petition because the requested service extensions do not comply with the BPU's Main Extension Regulations, N.J.A.C. 14:3-8.1 to -8.13, and the petitioner failed to prove entitlement to an exemption. In effect, the Main Extension Regulations, which became operative on March 20, 2005, prohibit regulated utilities from paying for or financially contributing to extensions in certain areas not designated for growth according to the New Jersey State Planning Commission *651 State Plan Policy Map (State Planning Map), unless the applicant for the extension proves that it qualifies for one of the exemptions in N.J.A.C. 14:3-8.8. N.J.A.C. 14:3-8.6.
In the published notice for a March 2, 2004 public hearing at which proposed amendments to the then-existing rules were to be considered, the BPU summarized the effect of the amendments as follows:
The Board of Public Utilities (Board) is proposing amendments, repeals and new rules to ensure that programs reflect the smart growth policy goals of the State. The amendments, repeals and new rules will govern the responsibility borne by regulated entities for the costs of certain investments in infrastructure, based on whether the development served by the infrastructure is in an area designated for growth under the State Development and Redevelopment Plan (State Plan).
The proposed amendments and new rules replace various existing rules governing extensions of service with one consolidated, comprehensive set of new extension rules that reflect the State's smart growth policies for addressing the problems of sprawl development. The existing extension rules [sic] primary focus is on when the regulated entity must provide extensions free of charge to applicants, and when and how it may charge applicants for new extensions. The existing rules make no distinction between extensions serving smart growth development in areas designed for growth under the State Plan, and extensions serving sprawl development.
This has resulted in subsidies to development in outlying areas, and has perpetuated barriers to development and redevelopment in areas designated for growth under the State Plan. The proposed amendments, repeals and new rules are intended to replace this outdated regulatory scheme with one that ensures that the cost of all extensions of infrastructure will reflect State smart growth policy.
[36 N.J.R. 276-77 (January 20, 2004).]
Without equivocation, the BPU has made it clear that its amendments to the previously existing rules are intended to "ensure[ ] that the cost of all extensions of infrastructure will reflect State smart growth policy." Id. at 277. In this case, Centex argues that the resulting Main Extension Regulations adopted by the BPU exceed the narrowly circumscribed authority delegated pursuant to N.J.S.A. 48:2-27 and are therefore void. Centex argues that the Main Extension Regulations inappropriately give regulatory effect to the State Plan because the regulations were expressly adopted to implement the State Plan and smart growth principles. Centex further argues that the BPU ignored relevant facts in denying Centex an exemption from the Main Extension Regulations pursuant to N.J.A.C. 14:3-8.8(a)(4) and -8.8(a)(6) (2004)[1], and also that the BPU violated due process and the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -25, by failing to provide Centex with an opportunity to be heard at the meeting at which the petition was considered and by failing to provide Centex with certain evidence on which the order was based.
*652 The Board responds that its Main Extension Regulations are a proper exercise of its statutory authority and that it gives appropriate consideration to the State Plan and to comments and recommendations from the Office of Smart Growth. It contends that it properly determined that the Centex project was inconsistent with smart growth principles and that the benefits of smart growth outweigh any benefits presented by Centex.
We agree with Centex that the BPU's interpretation of N.J.S.A. 48:2-27 is inconsistent with the function of that statute, as clarified in prior decisions, and is ultra vires. We therefore vacate the November 30, 2007 order and remand the matter to the BPU for further proceedings. In light of that disposition, we do not reach Centex's additional arguments.
In August 2006, Centex, a Texas-based construction company, began developing Colts Neck Crossing, the property in Howell, involved in this appeal. The 555-unit age-restricted residential development is to be spread over 334 acres on several lots in Block 184 of Howell's tax map and is located at the corner of Colts Neck Road and Route 33. On the State Planning Map, Colts Neck Crossing falls within Planning Area 4B, Rural/Environmentally Sensitive, which is an "area not designated for growth" under the BPU's Main Extension Regulations. N.J.A.C. 14:3-8.2.
Colts Neck Crossing was first proposed by Centex's predecessor-in-title, Crawford Holdings (Crawford), in 2002. Colts Neck Crossing was rezoned in 2002 from Highway Development 2 Zone (HD-2) and Agricultural Rural Estate 1 Zone (AGE-6) to Planned Retirement Community Zoning District. In May 2002, Verizon New Jersey, Inc. (Verizon) agreed in writing to extend telephone services to Colts Neck Crossing at no cost to Crawford. Other utilities agreed to provide service, but no other public utility agreed in writing to cover the cost of service extensions. For example, Jersey Central Power and Light (JCP & L) voiced its acceptance of Crawford's plan and indicated that it could supply service, but it did not offer or agree to pay for the necessary extensions.
Although Howell's planning board had granted preliminary water and final sewer approvals and approved final site and subdivision plans by 2004, Howell revoked all its approvals and rezoning in or about the spring of 2005. Crawford sued Howell in January 2006, and, following a court order granting partial summary judgment in favor of Crawford setting aside the purported revocations, the parties reached a settlement agreement on July 2, 2006. Pursuant to that settlement, it was agreed that Colts Neck Crossing would include seventy-two age-restricted multi-family affordable housing units, and it would contribute to Howell's third round affordable housing obligation under the Fair Housing Act, N.J.S.A. 52:27D-301 to -329. Centex purchased the property from Crawford in July 2006 and began construction the following month.
On or about November 20, 2006, Centex filed a petition for utility service extensions pursuant to N.J.S.A. 48:2-27. Centex requested that the BPU order four regulated utilitiesJCP & L, Verizon, New Jersey Natural Gas Company (NJNG) and New Jersey-American Water Company (NJAW)to construct and pay for utility extensions to Colts Neck Crossing. The cost for such utility extensions was estimated to be $1,910,425 for electric, $919,000 for telephone, $2,876,635 for gas, and $3,193,716 for water. The BPU considered Centex's petition at a November 28, 2007 meeting.[2]
*653 On November 30, the Board issued an order rejecting Centex's petition for an extension of services for natural gas, water, and electric service pursuant to N.J.S.A 48:2-27 and N.J.A.C. 14:3-8.8(a)(4) (2004) and N.J.A.C. 14:3-8.8(a)(6) (2004). The Board found that the project was located in an area not designated for growth. Hence, the regulated entities were not permitted to pay for or financially support the extension. The Board also found that Centex failed to establish that it qualified for the "significant public good" exemption set forth in N.J.A.C. 14:3-8.8(a)(6) (2004), and that Centex also failed to establish, as to all the utilities except Verizon, qualification for the exemption set forth in N.J.A.C. 14:3-8.8(a)(4) (2004) for voluntary extensions by the utility. Only Verizon, which had agreed in writing prior to March 20, 2005, to build and pay for a service extension, was required to pay for its extension of telephone wires to the development; all other utility extension costs would have to be borne by Centex.
Before examining Centex's arguments, we must set forth the standards for reviewing an agency's interpretation of legislation. Generally, an agency charged with enforcement of a statute is entitled to great deference in its interpretation of the statute. In re Distribution of Liquid Assets upon Dissolution Reg'l High Sch. Dist. No. 1, 168 N.J. 1, 10-11, 773 A.2d 6 (2001). Such deference is required because "agencies have the specialized expertise necessary to enact regulations dealing with technical matters...." N.J. League of Municipalities v. Dep't of Cmty. Affairs, 158 N.J. 211, 222, 729 A.2d 21 (1999). Thus, "agency rules are accorded a presumption of validity and reasonableness, and the challenging party has the burden of proving the rule is at odds with the statute." In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 489, 852 A.2d 1083 (2004) (internal citations omitted).
On the other hand, we have recognized that
[a]n administrative agency only has the powers that have been "expressly granted" by the Legislature and such "incidental powers [as] are reasonably necessary or appropriate to effectuate" those expressly granted powers. N.J. Guild of Hearing Aid Dispensers v. Long, 75 NJ. 544, 562, 384 A.2d 795 (1978) (quoting In re Regulation F-22 Office of Milk Indus., 32 N.J. 258, 261, 160 A.2d 627, (I960)). "Where there exists reasonable doubt as to whether such power is vested in the administrative body, the power is denied." In re Closing of Jamesburg High Sch., 83 N.J. 540, 549, 416 A.2d 896 (1980).
[Avalon v. N.J. Dep't of Envtl Prot, 403 N.J.Super. 590, 607 (App.Div.2008), certif. denied, 199 N.J. 133 (2009).]
An agency's regulation "`may not under the guise of interpretation ... give the statute any greater effect than its language allows.'" In re Freshwater Wetlands, supra, 180 N.J. at 489, 852 A.2d 1083 (quoting In re Valley Rd. Sewerage Co., 154 N.J. 224, 242, 712 A.2d 653 (1998) (Garibaldi, J., dissenting)). An agency's regulations will be invalidated if they are "inconsistent with the statute [they] purport[ ] to interpret," Smith v. Dir., Div. of Taxation, 108 N.J. 19, 27, 527 A.2d 843 (1987), or they violate the "express or implied legislative policies" of the enabling act. GE Solid State, Inc. v. Dir., Div. of *654 Taxation, 132 N.J. 298, 306, 625 A.2d 468 (1993). "[A]n administrative interpretation [that] attempts to add to a statute something that is not there can furnish no sustenance to the enactment." Serv. Armament Co. v. Hyland, 70 N.J. 550, 563, 362 A.2d 13 (1976). Furthermore, we have stated that when regulations are promulgated without explicit legislative authority and implicate "important policy questions," they are better off decided by the Legislature. Avalon, supra, 403 N.J.Super. at 607, 959 A.2d 1215; Burlington County Evergreen Park Mental Hosp. v. Cooper, 56 N.J. 579, 598-99, 267 A.2d 533 (1970).
On appeal, Centex argues that the Board's Main Extension Regulations must be set aside because they violate N.J.S.A. 48:2-27, the statute from which the Main Extension Regulations derive their authority; they require public utilities to give undue preference to customers located within smart growth areas in contravention of N.J.S.A. 48:34-4; and they have given the State Plan and smart growth principles regulatory effect in contravention of established law. Centex also contends the Board ignored relevant facts and misapplied principles of law in denying Centex an exemption pursuant to N.J.A.C. 14:3-3.8(a)(4) (2004) or 14:3-8.8(a)(6) (2004). It also contends the Board acted in violation of the Administrative Procedure Act as well as due process by denying Centex the opportunity to be heard at the November 28, 2007 Board hearing and failing to provide Centex with evidence upon which the Board relied in rendering its decision.
The Board observes that it has a statutory mandate under N.J.S.A. 48:2-23 to "conserve and preserve" the environment and under N.J.S.A. 48:2-27 to order utilities to pay the cost of extensions that are "reasonable and practicable." It points out that it satisfied due process and conducted public hearings upon notice, prior to adopting its amendments to the Main Extension Regulations. It emphasizes that the amendments ensure that the Main Extension Regulations reflect the State's smart growth policies. The Board notes that it considered Centex's argument that affordable housing is a public good and, as such, warranted an exemption from the Main Extension Regulations, but the Board concluded that the affordable housing component of the subject project made up less than one-eighth of the total number of units served by the extensions. The Board further reasoned that the units are required under the relevant affordable housing regulations, and recognition of the fulfillment of such obligation as a public good under the Main Extension Regulations would render the rules meaningless. As to the claimed procedural irregularities, the Board noted that there are no adjudicatory facts in dispute that would necessitate a hearing.
At the heart of the present appeal is whether the authority of the BPU to incorporate smart growth principles must be found in the statutory provisions enabling it to act in the field or whether such authority is properly derived from the general provisions of the State Planning Act. We hold the authority must be stated in the Board's enabling statute or, if expressed in a general statutory provision, the authority must identify its intent to delegate additional or incidental powers to the administrative agency granted such authority.
The BPU has since the early twentieth century enjoyed "general supervision and regulation of and jurisdiction and control over all public utilities ... and their property, property rights, equipment, facilities, and franchises...." N.J.S.A. 48:2-13(a). The BPU is authorized to "[f]ix just and reasonable standards, classifications, *655 regulations, practice, measurements or service to be furnished, imposed, observed, and followed by any public utility[.]" N.J.S.A. 48:2-25(a). To achieve these ends, the BPU is empowered by N.J.S.A. 48:2-12 to "make all needful rules for its government and other proceedings." The BPU is also permitted to "require any public utility to furnish ... and perform[ ]... service in a manner that tends to conserve and preserve the quality of the environment and prevent the pollution of the waters, land and air of this State[]...." N.J.S.A. 48:2-23.
Generally speaking, the BPU's power to regulate utilities is broad. "Our courts have consistently held that the Legislature in Title 48 intended to delegate the widest range of regulatory power over public utilities to the [BPU]." Deptford v. Woodbury Terrace Sewerage Corp., 54 N.J. 418, 424, 255 A.2d 737 (1969). The Court has further stated that BPU's powers extend beyond those expressly granted by statute "`to include incidental powers that the agency needs to fulfill its statutory mandate.'" In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling, Stranded Costs & Restructuring Filings, 167 N.J. 377, 384, 771 A.2d 1163 (2001) (quoting In re Valley Rd. Sewerage Co., supra, 154 N.J. at 235, 712 A.2d 653), cert. denied, 534 U.S. 813, 122 S.Ct. 37, 151 L.Ed.2d 11 (2001)).
But the New Jersey Supreme Court has held that the BPU's jurisdiction to order service extensions is circumscribed by the plain language of N.J.S.A. 48:2-27. Bd. of Fire Comm'rs of Fire Dist. No. 3, Piscataway v. Elizabethtown Water Co., 27 N.J. 192, 200, 142 A.2d 85 (1958) ("[T]he authority of the [BPU] to [promulgate service extension rules] is regulated by N.J.S.A. 48:2-27, and to the extent that any rule contravenes the statute as interpreted, it has no validity.").

N.J.S.A. 48:2-27 provides:
The board may, after hearing, upon notice, by order in writing, require any public utility to establish, construct, maintain and operate any reasonable extension of its existing facilities where, in the judgment of the board, the extension is reasonable and practicable and will furnish sufficient business to justify the construction and maintenance of the same and when the financial condition of the public utility reasonably warrants the original expenditure required in making and operating the extension.
Despite the Legislature's use of the word "may," we have held that N.J.S.A. 48:2-27 is mandatory, and that the BPU must order an extension if it determines that its "three preconditions" are met. Hilton N.J. Corp. v. Atlantic City Elec. Co., 205 N.J.Super. 217, 223, 500 A.2d 728 (App.Div.1985); see also Golden Nugget Atlantic City Corp. v. Atlantic City Elec. Co., 229 N.J.Super. 118, 120-21, 550 A.2d 1267 (App.Div.1988) (stating that the statute "requires" BPU to order an extension if the extension (1) is reasonable and practicable, (2) would furnish sufficient business to justify the extension, and (3) if the financial condition of the utility reasonably warrants the expenditure).
Prior to 2004, the BPU's Main Extension Regulations specified when a regulated utility was required to provide extensions free of charge to applicants "and when and how [the utility] may charge applicants for new extensions." 36 N.J.R. at 276. The pre-2004 rules did not integrate environmental or land use concerns into the regulation of service extensions; however, in consideration of the policy goals as articulated in the State Planning Act and two executive orders issued by then-Governor McGreevey, the BPU dramatically *656 altered its Main Extension Regulations to incorporate smart growth planning principles and goals.
The first executive order created the Smart Growth Policy Council "[t]o ensure that State agencies incorporate the principles of smart growth and the State Plan into their functional plans and regulations." Executive Order No. 4, 34 N.J.R. 951(a), 951-52 (Mar. 4, 2002). The Council was granted the power, among other things, to "[d]evelop and implement inter-and intra-departmental procedures and programs to assure that State agency functional plans, programs, and projects are consistent with and serve to [sic] the principles of smart growth and implement the State Plan"; "[r]ecommend legislative and administrative changes to advance the principles of smart growth and the State Plan"; "[e]nsure that State ... infrastructure spending and regulation are consistent with principles of smart growth and the State Plan"; and "[d]evelop initiatives to assist local government and communities to achieve smart growth objectives." 34 N.J.R. at 951. The BPU was represented on the Smart Growth Policy Council by its president.
The second executive order, effective October 24, 2002, ordered that all "[r]elevant State agencies and the Office of Administrative Law shall develop and implement a system that will give priority to applications and appeals involving development and redevelopment in areas designated for smart growth." Executive Order No. 38, 34 N.J.R. 4015 (Dec. 2, 2002). The BPU is not specifically listed as a "relevant state agenc[y]" in the executive order, though the order referenced other agencies, including the Housing and Mortgage Finance Agency, the Economic Development Authority, the Commerce and Economic Growth Commission, the Department of Community Affairs, the Department of Environmental Protection, and the Department of Transportation. Ibid.
The State Plan and the smart growth principles contained therein are a product of the State Planning Act, N.J.S.A. 52:18A-196 to -207. The State Planning Act creates a State Planning Commission to adopt and revise the State Plan and to "coordinate planning activities and establish Statewide planning objectives...." N.J.S.A. 52:18A-197, -199; Mount Olive Complex v. Twp. of Mount Olive, 340 N.J.Super. 511, 540-41, 774 A.2d 704 (App. Div.2001), certif. granted, 174 N.J. 359, 807 A.2d 192 (2002) (remanding on other grounds). The State Plan is meant to "halt suburban sprawl," Mount Olive, supra, 340 N.J.Super. at 541, 774 A.2d 704, and guide "growth, development, renewal, and conservation ..." through coordinated land-use planning. N.J.S.A. 52:18A-199(a). The legislative findings of the State Planning Act call upon the "several levels of government [to] cooperate in the preparation of and adherence to sound and integrated plans[,]" N.J.S.A. 52:18A-196(b), but neither the legislative findings, nor the text of the entire statute, contains specific language referencing the BPU or implicating N.J.S.A. 48:2-27. N.J.S.A. 52:18A-196 to -206.
A number of decisions by this court have concluded that the State Plan carries no regulatory effect. In re Protest of Coastal Permit Program Rules, 354 N.J.Super. 293, 357, 807 A.2d 198 (App.Div.2002); Mount Olive, supra, 340 N.J.Super. at 543, 774 A.2d 704; N.J. Builders Ass'n v. Dep't Envtl. Prot, 306 N.J.Super. 93, 97 (App. Div.1997). We have noted that the State Plan itself states that it is inappropriate "`to use the State Plan directly to formulate codes, ordinances, administrative rules, or other regulations. Such regulations should be formulated to carry out the *657 master and functional plans of the responsible agencies.'" In re Protest of Coastal Permit Program Rules, supra, 354 N.J.Super. at 356, 807 A.2d 198 (quoting the State Plan at ix, http://www.state.nj.us/ dca/divisions/osg/plan/). And crucially, we have recognized that the State Plan does not increase the authority of the state agencies to regulate land use. Id. at 356-57, 807 A.2d 198. As noted in the State Plan, a state agency may only make modifications to its regulations to reflect the State Plan "`if such modifications are within the scope of the agency's authority. If the necessary modifications would exceed the agency's authority, it should seek to obtain the authority through normal legislative... processes.'" Id. at 357, 807 A.2d 198 (quoting the State Plan at 11).
With that understanding of the State Planning Act, we return to the BPU's Main Extension Regulations, which amended the existing rules to ensure "that the cost of all extensions of infrastructure will reflect State smart growth policy." 36 N.J.R. at 277. The BPU's Main Extension Regulations, at the time Centex filed its petition in November 2006, were phasing out the authority of a regulated entity to financially contribute to service extensions in areas not designated for growth under the State Plan. N.J.A.C. 14:3-8.6(a) (2004). During a three-year phasing out period, a utility could choose to contribute to extensions in an area not designated for growth according to various formulae, but after January 1, 2007, regulated entities were prohibited from paying for or financially supporting an extension in an area not designated for growth unless it qualified for an exemption under N.J.A.C. 14:3-8.8. N.J.A.C. 14:3-8.6(c), -8.6(f) (2004).
At the time of Centex's petition, the" Main Extension Regulations provided the following exemptions, among others, from the prohibition of N.J.A.C. 14:3-8.6. N.J.A.C. 14:3-8.8 (2004). N.J.A.C. 14:3-8.8(a)(4) provided an exemption for "extensions already in progress as of March 20, 2005," further clarified by N.J.A.C. 14:3-8.8(g) as extensions for which construction had started or the utility had committed in writing to pay for or financially support the extension. The "extensions-in-progress" exemption remains in effect, with only slight modifications not of significance to this appeal. N.J.A.C. 14:3-8.8(a)(3), -8.8(a)(4), and -8.8(i).
The Main Extension Regulations at the time of Centex's petition also provided an exemption for projects that "will provide a significant public good." N.J.A.C. 14:3-8.8(a)(6) (2004). To demonstrate a significant public good, the petitioner was required to show that "the project would provide a significant benefit to the public or the environment," N.J.A.C. 14:3-8.8(h)(1) (2004); that "the project is consistent with smart growth" or "outweighs the benefits of smart growth[,]" N.J.A.C. 14:3-8.8(h)(2) (2004); and that "[t]here is no practicable alternative means of providing the benefit while still complying with [the] subchapter[,]" N.J.A.C. 14:3-8.8(h)(3) (2004). In determining the project's consistency with smart growth, the BPU was required to consult with the Office of Smart Growth and other state agencies. N.J.A.C. 14:3-8.8(h)(2) (2004).
At the time of Centex's petition, the regulations also contained a separate exemption for extraordinary hardship. N.J.A.C. 14:3-8.8(a)(7) (2004). This required a showing that (1) compliance would cause extraordinary hardship; (2) the hardship results from unique characteristics of the project not shared by other projects in the region; (3) the unique circumstances arise "from the project itself and not from the circumstances or situation of the regulated entity or its customers"; and (4) "[n]either the extraordinary *658 hardship nor the unique circumstances are the result of any action or inaction by the regulated entity, its shareholders, or its customers." N.J.A.C. 14:3-8.8(i)(1) to -8.8(i)(4) (2004).
The BPU's current regulations, consistent with the "phasing out" of a utility's ability to pay for extensions in areas not designated for growth, eliminated the cost formulas for utilities that wished to voluntarily contribute to utility extensions in those areas. Presently a utility may not voluntarily contribute to the costs of extensions in areas not designated for growth unless it falls under one of the exemptions in N.J.A.C. 14:3-8.8. N.J.A.C. 14:3-8.6(c)(1). Another significant change in the Main Extension Regulations between the time of Centex's petition and today is that a petition is required to demonstrate both a "significant public good" and "extraordinary hardship" to receive an exemption on either of those grounds. N.J.A.C. 14:3-8.8(b)(1), -8.8(b)(2).
The definition of an "area not designated for growth" has remained unchanged from the 2004 promulgation to the current version of the BPU's Main Extension Regulations. An area not designated for growth is defined as one that is not found in the following areas on the New Jersey State Planning Commission State Plan Policy Map: Planning Area 1; Planning Area 2; a designated center; an area identified for growth pursuant to a petition for municipal plan endorsement approved by the State Planning Commission pursuant to N.J.A.C. 5:85-7; and certain growth areas established by regional planning commissions. N.J.A.C. 14:3-8.2.
Thus, the practical effect of the BPU's amended regulations is that utilities are prohibited from contributing financially to extensions unless they are in an area designated for growth, or unless they serve a significant public good that outweighs the benefits of smart growth, and the petitioner would be subject to extraordinary hardship. The question thus raisedand answered by the BPU in the affirmativeis whether the legislative purpose of N.J.S.A. 48:2-27 is consistent with the agency's Main Extension Regulations that prevent utilities from subsidizing service extensions in "areas not designated for growth," which are admittedly environmentally sensitive areas.
The BPU found that the extension of service sought by Centex was neither a "reasonable extension" nor "`reasonable and practicable' pursuant to N.J.S.A. 48:2-27." The BPU provided the following explanation of its authority to define the word "reasonable" to encompass environmental considerations:
In exercising its authority to determine whether an extension is reasonable, the Board must consider other language within its enabling statutes, including N.J.S.A. 48:2-23, which requires that it act, "in a manner that tends to conserve and preserve the quality of the environment and prevent the pollution of the waters, land and air of this State." See Pine Belt Chevrolet v. Jersey Cent. Power and Light Co., 132 N.J. 564, 579, 626 A.2d 434 (1993) (noting in relevant part that "all parts of the statute must be read together so that each part is consistent with the whole"). In reviewing the environmental reasonableness of extensions, the Board must also consider all relevant legal authority, including its enabling statute, the New Jersey State Planning Act, N.J.S.A. 52:18A-196 et seq., EO 4 and EO 38.
[In re Centex Homes, BPU, Final Decision, (November 30, 2007) at 3.]
Although we are reluctant to invalidate the regulations of an administrative agency, we must conclude that the BPU's interpretation of its authority under *659 N.J.S.A. 48:2-27 cannot be harmonized with the purpose of the statute and the BPU's narrowly circumscribed duty in administering the statute, as clarified by prior decisions of the Supreme Court and the Appellate Division.
In Board of Fire Commissioners, supra, 27 N.J. at 200, 142 A.2d 85, the New Jersey Supreme Court stated that "the authority of the Board to [promulgate Main Extension Regulations] is regulated by N.J.S.A. 48:2-27, and to the extent that any rule contravenes the statute as interpreted, it has no validity." The Court made clear that the BPU's power to act in the area of extensions of service is circumscribed by the language of N.J.S.A. 48:2-27:
[The BPU's] blanket fiat is violative of the letter and spirit of the statute, ... [U]nder the statutory language the ultimate decision rests in the discretion of the Board, subject to the conditions prescribed [in the statute]. Thus, each case must depend on its own facts and circumstances, viewed in the light of the demands of the statute.

[Id. at 206, 142 A.2d 85 (emphasis added).]
Unquestionably, the BPU enjoys a measure of discretion to promulgate and enforce rules that regulate service extensions. In Van Holten Group v. Elizabethtown Water Co., the New Jersey Supreme Court upheld the validity of a BPU regulation designed to allocate costs between utilities and developers following a service extension. 121 N.J. 48, 51, 577 A.2d 829 (1990). The regulation allowed (but did not require) a developer to initially bear the cost of an extension and to be paid back in the event that the development generated sufficient business for the utility.[3] The Court found "that [such an] administrative application of N.J.S.A. 48:2-27 comports with the legislative intent underlying the statute, and constitutes an authorized exercise of agency discretion." Id. at 65, 577 A.2d 829. The regulation upheld in Van Holten allocated costs between developers and utilities. By contrast, the regulation challenged by Centex functions to protect the environment and encourage smart growth, and to such end, it prohibits any allocation of cost, unless the applicant can qualify for an exemption. We cannot find, as the Court did in Van Holten, that the present regulation "comports with the legislative intent underlying the statute," id. at 65, 577 A.2d 829, as opposed to the intent underlying the executive orders and a different statute.
The Main Extension Regulations, as currently written and as applied to Centex, make a far more extreme departure from N.J.S.A. 48:2-27. Significantly, where N.J.S.A. 48:2-27 confers a duty on the BPU to order that utilities pay for extensions in three enumerated circumstances, the Main Extension Regulations prohibit voluntary payment where the project is within an area not designated for growth.[4] This is a construction of the statute that, logically speaking, constitutes an extreme departure from the purpose of *660 N.J.S.A. 48:2-27, as construed by the Supreme Court.
Even if it is appropriate for the BPU to interpret "reasonable" to include "environmentally reasonable," the statute would still only grant the authority to require a public utility to pay for an extension upon satisfaction of the relevant criterianot to prevent it from paying because the project is in an area not designated for growth on the State Planning Map. Given the Court's prior invalidation of BPU regulations for adding criteria not specifically enumerated in the statute, the prior judicial characterizations of the BPU's role in interpreting the statute as narrow and non-discretionary, and the drastic refocusing of the BPU's Main Extension Regulations to reflect smart growth goals, we are constrained to conclude that it changes the meaning of the statute under the guise of interpretation and therefore must be invalidated. In re Freshwater Wetlands, supra, 180 N.J. at 489, 852 A.2d 1083.
The legislative intent underlying N.J.S.A. 48:2-27 does not have land use or environmental concerns as main purposes. The statutory law governing service extensions embodied in N.J.S.A. 48:2-27 was enacted in 1911 when the Legislature established the BPU. L. 1911, c. 195, § 17(c). The language in the original 1911 session law is nearly identical to the version of N.J.S.A. 48:2-27 currently in effect:
The "board shall have the power ... (c) [t]o establish, construct, maintain, and operate any reasonable extension of its existing facilities, where, in the judgment of said board such extension is reasonable and practicable and will furnish sufficient business to justify the construction and maintenance of the same, and when the financial condition of the said public utility reasonably warrants the original expenditure required in making and operating such extension.
[L. 1911, c. 195, § 17(c).]
In 1911, the BPU was not vested with the authority to consider environmental concerns (the BPU was not vested with that power until 1970, see L. 1970, c. 273). Thus, at the time of the enactment of N.J.S.A. 48:2-27, the Legislature could not have intended N.J.S.A. 48:2-27 to apply to environmental and land use concerns.
Moreover, we have explicitly stated, in the context of cases examining N.J.S.A. 48:2-27, that the controlling analysis has related to economics and practicality: "Historically, in cases arising under N.J.S.A. 48:2-27, the search has been for `a solution which equitably protects the substantial financial interests of utilities, developers, and property purchasers in affected areas.'" Golden Nugget, supra, 229 N.J.Super. at 124, 550 A.2d 1267 (quoting Norman C. Thomas, Public Utilities: Extensions of Service, 16 Rutgers L.Rev. 318, 318 (1962)); see also Langan v. W. Keansburg Water Co., 51 N.J.Super. 41, 47, 143 A.2d 185 (App.Div.), certif. denied, 28 N.J. 56, 145 A.2d 167 (1958); Twp. of Lakewood v. Lakewood Water Co., 29 N.J.Super. 422, 431-32, 102 A.2d 671 (App. Div.1954).
Though the word "reasonable" has never been specifically defined by the court, typically, the "reasonableness" prong of N.J.S.A. 48:2-27 has been examined with reference to the practicality or viability of the extension. In Langan, supra, for example, this court applied the "reasonable and practicable" prong to the facts relating to customer demand for utility services:
There is some doubt here whether public convenience and necessity require the extension, and whether the extension is reasonable and practical [sic]. [The developer] testified that he anticipated that eventual purchasers of homes from him to the number of 50 would require service from the Water Company. *661 There is no certainty that, under [the] zoning requirements, he will be permitted to replot his tract into more than 25 building lots. There is absent any proof which would lead to the certain conclusion that even one home will be constructed by him. He does not agree to execute any contract for water service. All of the 21 individual owners who have joined with him as parties ... now obtain water from their private wells. None has testified as to the inadequacy of his present supply; neither has any agreed to use the Water Company facilities when available.
[51 N.J.Super. at 47, 143 A.2d 185.]
Overall, while there is no definitive judicial interpretation for the word "reasonable" in this context, there is no judicial precedent for interpretation that encompasses factors beyond the financial and practical factors traditionally recognized as controlling under the N.J.S.A. 48:2-27 analysis.
To be sure, N.J.S.A. 48:2-23 provides that the Board may require a public utility to furnish safe, adequate and proper service, including in a manner that tends to conserve and preserve the quality of the environment and prevent the pollution of the waters, land and air of the State. More fully, the statute provides:
The board may, after public hearing, upon notice, by order in writing, require any public utility to furnish safe, adequate and proper service, including furnishing and performance of service in a manner that tends to preserve and conserve the quality of the environment and prevent the pollution of the waters, land, and air of this State, ... and to maintain its property and equipment in such condition as to enable it to do so.
[N.J.S.A. 48:2-23 (emphasis added).]
That language cannot be presumed to make environmental issues or land use issues the overriding consideration in a determination to extend service to a new residential development. Nevertheless, we must address the BPU's argument that its power to define "reasonable" as "environmentally reasonable" is incidental to the environmental mandate embodied in N.J.S.A. 48:2-23.
We recognize that the BPU's powers extend beyond those expressly granted by statute "`to include incidental powers that the agency needs to fulfill its statutory mandate,'" In re PSE & G's Rate Unbundling, supra, 167 N.J. at 384, 771 A.2d 1163 (quoting In re Valley Rd. Sewerage Co., supra, 154 N.J. at 235, 712 A.2d 653). Indeed, the Main Extension Regulations state that they are "intended to fulfill the mandate of N.J.S.A. 48:2-23 that regulated entity service be ... furnished in a manner that tends to conserve and preserve the quality of the environment." When we consider the narrow and particularized nature of the N.J.S.A. 48:2-27 analysis, we cannot say that the language of N.J.S.A. 48:2-23 demonstrates a legislative intent to integrate an environmental factor into the N.J.S.A 48:2-27 analysis in such a way as to drastically change the function of the statute from a regulation of public utilities to the regulation of urban and suburban sprawl. That change is signaled, if at all, by the State Planning Act. It is on that putative authority that the Board has relied. Ultimately, where there is a conflict between a specific provision of a statute and a general provision of a statute, the specific provision must control. Wilson v. Unsatisfied Claim and Judgment Fund Bd., 109 N.J. 271, 278, 536 A.2d 752 (1988).
Centex argues that the language of N.J.S.A. 48:2-23 only empowers the BPU to require utilities to furnish environmentally sound service, and that it does not alter the purpose or intent of N.J.S.A. 48:2-27, which concerns the narrow issue *662 of allocation of payment for service extensions. The BPU's duties under N.J.S.A. 48:2-27, Centex argues, concern only whether utilities must pay for extensions of service and not the quality or environmental soundness of that service.
The BPU, on the other hand, argues that N.J.S.A. 48:2-23 confers a broad environmental mandate to integrate environmental considerations into all aspects of its decision-making, and that by preventing utilities from investing in environmentally sensitive areas, the BPU is, in fact, ensuring that the utility service is environmentally sensitive. We note that while the language of N.J.S.A. 48:2-23 requires that the BPU ensure environmental compliance by regulated utilities, it does not explicitly grant BPU with the broad environmental mandate it claims. We find that the statutory language of N.J.S.A. 48:2-23 itself does not provide a clear delineation of its scope, and there is no illuminating legislative history.
Generally, the cases interpreting N.J.S.A. 48:2-23 have neither been construed to provide the BPU with a general mandate to integrate environmental rules into its legislative rulemaking function, nor held it to be beyond the BPU's authority. While the BPU was "intended by the Legislature to have the widest range of regulatory power over public utilities," A.A. Mastrangelo, Inc. v. Comm'r of the Dep't of Envtl. Prot, 90 N.J. 666, 685 (1982), that power has never been cast in environmental terms. Rather, the cases speak of the BPU's broad power to regulate economic aspects of utilities. See ibid, (recognizing "broad range" of powers to regulate "economic factors" of solid waste management industry); In re PSE & G's Rate Unbundling, supra, 167 N.J. at 384, 771 A.2d 1163 (recognizing "broad discretion" over rate making); but see In re Pub. Serv. Elec. and Gas Co., 35 N.J. 358, 371, 173 A.2d 233 (1961) (recognizing, prior to the insertion of environmental language into N.J.S.A. 48:2-23, that power to ensure safe and adequate service be broadly construed).
The cases examining the environmental language of N.J.S.A. 48:2-23 have never construed it to provide a general mandate as broad as is urged by the BPU in this case. See, e.g., In re Penn Cent. Passenger Station, 57 N.J. 400, 402-04, 273 A.2d 42 (1971) (upholding a BPU order to investigate whether a train station was providing safe service); In re Valley Rd. Sewerage Co., supra, 154 N.J. at 238, 712 A.2d 653 (BPU revoking sewer utility's franchise and appointing receiver where the utility had an egregious environmental record); Pennsylvania R.R. Co. v. Dep't of Pub. Utils., 14 N.J. 411, 434, 437, 102 A.2d 618 (1954) (where a railroad was required to erect a marker on railroad tracks in the interest of safety). In In re New Jersey Board of Public Utilities, we held that N.J.S.A. 48:2-23, read in conjunction with all the BPU's enabling legislation, confers upon BPU the power to "ensure that disposal operators subject to its jurisdiction have the economic capacity to effectuate the environmental mandates of the [Department of Environmental Protection]." 200 N.J.Super. 544, 558 (App.Div.1985). In that case, BPU was authorized to require that utilities abide by environmental laws; we did not state that BPU was authorized to make environmental law.
In summary, N.J.S.A. 48:2-23 has never been construed as broadly as the BPU urges. The broad construction used by the BPU would drastically change the meaning and function of N.J.S.A. 48:2-27. This is an issue of law as to which we are not bound to defer to the interpretation of the administrative agency. Serv. Armament Co., supra, 70 N.J. at 563, 362 A.2d 13. By way of clarification, we only *663 hold that N.J.S.A. 48:2-23 does not provide the authority to make such a drastic alteration to N.J.S.A. 48:2-27, given the limited authority of the BPU to contravene the Legislature's three-prong rule expressed in past cases examining N.J.S.A. 48:2-27.
Finally and more fundamentally, we must emphasize that the State Planning Act itself and the executive orders encouraging compliance with the State Planning Act cannot be considered "enabling legislation" for the BPU to make what are essentially land use decisions in exercising its statutory authority. The State Planning Act itself does not purport to enlarge the authority of state agencies to integrate land use concerns into their rulemaking or adjudicative power. In re Protest of Coastal Permit Program Rules, supra, 354 N.J.Super. at 356-57, 807 A.2d 198.
The Legislature has specifically called for the State Plan to be worked into agency regulations in other statutes, and it could have done so in this case. For example, the Coastal Area Facility Review Act (CAFRA) explicitly requires that the Department of Environmental Protection coordinate its regulations with the State Plan. N.J.S.A. 13:19-17(b). Here, neither the BPU's enabling Legislation nor the State Planning Act specify that the BPU is to integrate the plan into its regulations. Surely, the language of the State Planning Act suggests that the BPU, as an "agency," should use the plan in exercising its discretionary authority where its decisions affect land use. However, we find that the language of the State Planning Act does not evince a legislative intent that the State Planning Act be integrated into the BPU's non-discretionary legislative mandate to determine the allocation of costs for service extensions in designated areas of the State Planning Map. If the Legislature wishes to grant the BPU authority to take smart growth principles into account in ordering service extensions, it should explicitly say so, as it did by amending CAFRA.
We understand that the Legislature has declared that smart growth is an important public policy goal, and in fact, its importance provides further reason to require legislative authorization before allowing smart growth principles to direct the course of BPU regulations where the authority for such direction is unclear. As has been observed, "a policy question of [great] significance lies in the legislative domain and should be resolved there. A court should not find such authority in an agency unless the statute under consideration confers it expressly or by unavoidable implication." Cooper, supra, 56 N.J. at 598, 267 A.2d 533.
Reversed.
NOTES
[1] At the time of Centex's petition, the Main Extension Regulations provided an exemption for projects that "will provide a significant public good" in subsection 8.8(a)(6). N.J.A.C. 14:3-8.8(a)(6) (2004). The "significant public good" exception still exists, but was recodified as N.J.A.C. 14:3-8.8(b)(1) and N.J.A.C. 14:3-8.8(h) with slight modifications. The extent and impact of the changes to the Main Extension Regulations since Centex's petition is explained, infra.
[2] Centex alleges it was denied an opportunity to appear and argue at the November 28, 2007 meeting.
[3] In its reply brief, Centex notes that under the prior enactment of the Main Extension Regulations, developers would initially pay for extensions, the cost of which would be refunded to the developer over time using revenue generated from the extension. It adds that "Centex has all along expected to pay the cost of extensions to the Project, which would be refunded to Centex pursuant to the refund formulas established by the Board." The Main Extension Regulations, as interpreted by the Board, preclude any financial contributions by the public utilities.
[4] The voluntary payment by Verizon is based upon its commitment to pay prior to March 20, 2005, the effective date of the amendments to the Main Extension Regulations.