**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3903-22

IN THE MATTER OF THE
PETITION OF NEW JERSEY
AMERICAN WATER
COMPANY FOR A
DETERMINATION
CONCERNING FENWICK
WATER TANK PURSUANT TO
N.J.S.A. 40:55D-19.

_____

Submitted October 16, 2024 – Decided November 20, 2024

Before Judges Chase and Vanek.

On appeal from the New Jersey Board of Public Utilities, Docket No. WO22010004.

Duane Morris, LLP, attorneys for appellant Paul Savas (David B. Amerikaner, on the brief).

Archer & Greiner, PC, attorneys for respondent New Jersey American Water Company (Niall J. O'Brien and James A. Boyd, Jr., of counsel and on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Board of Public Utilities (Sara M. Gregory, Assistant Attorney General, of counsel; Daren Richard Eppley and Terel L. Klein, Deputy Attorneys General, on the brief).

Brian O. Lipman, Director, attorney for respondent New Jersey Division of Rate Counsel (Brian O. Lipman and Susan E. McClure, Managing Attorney, of counsel; Christine M. Juarez, Assistant Deputy Rate Counsel, on the brief).

PER CURIAM

Intervenor Paul Savas appeals from the New Jersey Board of Public Utilities (BPU) July 12, 2023 final decision granting the New Jersey-American Water Company, Inc.'s (NJAWC) petition for relief from the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, and any Bernardsville land use ordinance, that may be applicable to its construction of a replacement water storage tank. Based on a thorough review of the record and our jurisprudence, we affirm.

I.

We glean the salient facts from the record. On March 10, 2020, NJAWC—a regulated public utility company that provides water for approximately 660,000 New Jersey residents—filed an application with the Zoning Board of Adjustment for the Borough of Bernardsville (the Zoning Board) requesting conditional use approval, variances from conditional use standards, preliminary and final major site plan approval, and bulk variances related to replacement of a water storage tank on Mendham Road in

Bernardsville (the Property). After hearing NJAWC's application, the Zoning Board adopted a resolution memorializing its denial.

The Property is in a historic area of Bernardsville where structures are limited to a height of thirty-five feet. The existing water tank has a 240,000-gallon capacity, occupies 3,310 square feet of the 17,667-square-foot Property, and is fifty-six feet tall. The proposed water tank would have a 750,000-gallon capacity, a 4,645-square-foot footprint, and a height of eighty-three feet. Because the existing water tank has been in operation since at least 1954, it predates any municipal zoning ordinance requirements and is a pre-existing, non-conforming use.

On January 4, 2022, NJAWC filed a petition with the BPU pursuant to N.J.S.A. 40:55D-19[1] seeking a determination that local municipal and MLUL approvals are not required for the construction of the proposed replacement water tank since it is necessary for the convenience, safety, and welfare of the public and there are no reasonable alternatives which could provide an equivalent public benefit. The NJAWC further explained in its petition that the proposed larger capacity water tank was needed to maintain the water supply to

---

[1] N.J.S.A. 40:55D-19 sets forth the requirements and process by which a public utility can appeal a municipal decision under the MLUL.

the Bernardsville community—as well as neighboring Somerset and Morris counties—due to the impending expiration and termination of a contract with the Morris County Municipal Utilities Authority (MCMUA). The MCMUA contract had allowed NJAWC to purchase up to one million additional gallons of water per day to cover any shortfall in the existing supply. The NJAWC posited that without the additional MCMUA water, there was a significant shortfall. Thus, the NJAWC contended the proposed replacement water tank is necessary to maintain adequate capacity and sufficient water pressure during peak demand for both consumer-usage and fire suppression.

On January 13, 2022, the BPU transferred the petition to the New Jersey Office of Administrative Law, and the matter was assigned to an Administrative Law Judge (ALJ). On March 22, 2022, the ALJ granted Savas intervenor status as a resident of Bernardsville.[2]

The ALJ held hearings on the petition on December 12, 13, and 14, 2022. NJAWC proffered the testimony of Donald C. Shields, a water utility engineer with twenty-six years of experience. Shields testified to the necessity of replacing the existing tank to fully address both capacity and safety issues.

---

[2] The ALJ also granted participant status to Bernardsville resident Karen Martin.

A-3903-22

Shields testified that on May 11, 2018, the MCMUA notified the NJAWC of its unilateral decision to terminate the original water supply agreement. He proffered that the loss of the MCMUA supply strains the present system significantly, requiring the NJAWC to secure water volume from a different location. Shields testified that to maintain the minimum required water pressure necessary to meet customer demand and provide adequate fire protection in the communities served by the existing water tank, the water must be stored at an elevation of at least 818 feet above sea level, pursuant to N.J.A.C. 7:10-11(a)(2).

Although the existing water tank on the Property meets this elevation requirement, during peak periods of water demand in the summer, the water reserves in the tank fall below New Jersey Department of Environmental Protection (NJDEP) mandated levels. Shields acknowledged he was not aware of any fires which were not able to be adequately responded to through using water in the existing tank.

Shields testified the NJAWC considered other options that would negate the need to construct the proposed water storage tank and found no suitable alternatives. Further, Shields testified that NJAWC considered forty-six other sites upon which to construct a water tank, each meeting the NJDEP's elevation and regulatory standards. All the alternative sites were ruled out, some for being

5 <span>A-3903-22</span>

encumbered with a structure that would need to be demolished, others were protected wetlands or preserved land. The alternative sites would also require a significant amount of infrastructure to connect pipelines at great cost, with every 1,500 feet of pipe costing over a million dollars. On cross-examination, Shields testified NJAWC did not consider the Property's estimated resale value in analyzing cost feasibility.

The testimony of expert Howard Woods, proffered by the New Jersey Division of Rate Counsel (Rate Counsel), was consistent with Shields's as to the inadequacy of the existing tank and the need for the proposed facilities. Woods acknowledged through his testimony that he had not visited the site.

Savas proffered the testimony of Giselle Diaz, a licensed professional engineer with twenty-five years of experience in asset management for water utility systems. Diaz had assisted the Zoning Board in evaluating NJAWC's initial application for conditional use approval and zoning variances. Diaz conceded she had not been supplied with sufficient evidence to assess if NJAWC correctly concluded the current water tank did not comply with NJDEP's fire safety standards.

Diaz initially opined the proposed water tank is not reasonably necessary because the costs and drawbacks of the new construction outweigh the potential

6

benefits. When asked to clarify why she felt the proposed water tank was not reasonably necessary, Diaz testified that in her opinion, "reasonably necessary" meant there was no other alternative whatsoever. When questioned further, she revisited her conclusion, acknowledging she did not have enough information to conclude the replacement tank was not reasonably necessary.

The Zoning Board proffered the testimony of Kenneth Jones, a licensed real estate broker, appraiser, photographer and drone pilot, who was hired to determine if there would be any valuation impact on Savas's and Martin's properties if the proposed water tank was constructed. Jones compared the properties to those in coastal communities where ocean-view homes are valued higher than those without comparable views. Jones testified that having the proposed water tank visible would diminish the value of Savas's property by fifty percent and reduce the value of Martin's property by forty percent.

Jones conceded that upon visiting the properties, he was unsure if the proposed water tank would be visible from each of the locations. Nonetheless, he concluded that "being next to an eyesore" would also negatively impact valuation.

The Zoning Board also proffered the testimony of Daniel Lincoln, a licensed architect and member of the Bernardsville Historic Preservation

Advisory Commission. Lincoln opined that Savas's and Martin's homes are historically significant to the community, in part because they are more than 100 years old.

The Zoning Board proffered the testimony of David Greenbaum, a seventeen-year Zoning Board member and its current president. Greenbaum articulated the Zoning Board's primary objection to the proposed water tank was its incongruity with the aesthetics of the surrounding community since it would be the largest structure in the town and substantially taller than the present water tower. Greenbaum further explained the members of the Zoning Board were concerned NJAWC had not been forthcoming with all the reasons the new water tank was needed and failed to identify the alternate sites they considered.

The ALJ found all of the witnesses to be professional, reasonable, and candid. However, she noted that Shields, Woods, and Diaz were the most objective witnesses, while Jones, Lincoln, and Greenbaum did not "even try to hide their dis[d]ain" for the proposed water tank. After considering the testimony, the ALJ determined there was credible evidence in the record establishing the costs and logistical barriers to pursuing an alternate site.

In the May 1, 2023 written decision, the ALJ made factual findings derived from the evidence adduced at the hearings which included

(1) [t]he [p]roposed [w]ater [t]ank has not been shown to have any adverse impact on the ambient noise levels or air quality in the neighborhood nor to result in an increase in truck or foot traffic; (2) NJAWC considered forty-six alternate sites for the new water tank aside from the Property; (3) there was no evidence that the proposed water tank would reduce property values in the surrounding community; and (4) NJAWC considered alternate methods to augment the water supply in order to meet the needs of the community before filing the petition pursuant to N.J.S.A. 40:55D-19.

Based on these factual findings, the ALJ concluded "that while alternative sites were identified and may be just as functional . . . there has been no showing that an alternative location is reasonably available . . . and will achieve the equivalent public benefit with <u>less</u> adverse impact on the environment, community, and local zoning plans." The ALJ also concluded

1. That the [p]roposed [w]ater [t]ank is reasonably necessary to provide safe, adequate, and reliable water services in New Jersey;

2. That the [p]roposed [w]ater [t]ank is reasonably necessary for the service, convenience, and welfare of the public;

3. That [NJAWC] considered alternative methods to building the [p]roposed [w]ater [t]ank . . . ;

4. That [NJAWC] considered alternative sites for the [p]roposed [w]ater [t]ank;

9

5. That the [p]roposed [w]ater [t]ank located at the [Property] is reasonable considering the alternatives; and

6. That based upon the record, the [p]roposed [w]ater [t]ank is not adverse to the environment, the public health, and/or the public welfare.

Predicated on these conclusions, the ALJ granted the NJAWC's petition pursuant to N.J.S.A. 40:55D-19 and ruled that any zoning or land use ordinance provisions contrary to the water tank's construction were deemed inapplicable. Rate Counsel, Savas, and the participants filed exceptions to the initial decision.

On July 12, 2023, the BPU adopted the initial decision in its entirety, with an effective date of July 17, 2023. This appeal follows.

II.

Savas argues the NJAWC failed to meet the statutory threshold of establishing it is reasonably necessary for the water tank to be constructed on the Property. Savas asserts the BPU shifted the burden of proof, improperly requiring him to prove to the contrary.

Our review of the final decision of an administrative agency is circumscribed, requiring reversal only where a board's decision is "arbitrary, capricious, or unreasonable, or . . . not supported by substantial credible evidence in the record as a whole." In re Stallworth, 208 N.J. 182, 194 (2011)

A-3903-22

(citing Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)). When making that determination, we are instructed to consider

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Ibid. (citing In re Carter, 191 N.J. 474, 482-83 (2007)).]

"In assessing those criteria, a court must be mindful of, and deferential to, the agency's 'expertise and superior knowledge of a particular field.'" Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). Thus, "[a] reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'" Stallworth, 208 N.J. at 194 (quoting Carter, 191 N.J. at 483). We, however, are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Carter, 191 N.J. at 483 (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)).

A-3903-22

Courts accord agency actions a presumption of validity and reasonableness, so the party challenging the ALJ's decision—and therefore the BPU's final administrative decision—bears the burden of demonstrating the action was unreasonable. See In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993); Bowden v. Bayside State Prison, 268 N.J. Super. 301, 304 (App. Div. 1993).

## III.

As a public water utility company, NJAWC falls within the BPU's regulatory control. N.J.S.A. 48:2-13(a). We have opined that the BPU's power to regulate utilities is broad. In re Centex Homes, LLC, 411 N.J. Super. 244, 254 (App. Div. 2009); see Twp. of Deptford v. Woodbury Terrace Sewerage Corp., 54 N.J. 418, 424 (1969).

The BPU is tasked with "requiring any public water utility to furnish safe, adequate and proper service . . . ." N.J.S.A. 48:2-23; see In re Pub. Serv. Elec. & Gas Co., 35 N.J. 358, 371 (1961). The Legislature vested the BPU with the "general supervision and regulation of and jurisdiction and control over all public utilities . . . and their property, property rights, equipment, facilities and franchises so far as may be necessary . . . ." N.J.S.A. 48:2-13(a).

A-3903-22

We review the BPU's final decision approving the NJAWC's petition under N.J.S.A. 40:55D-19, which states in part that municipal land use laws and zoning ordinances:

> shall not apply to a development proposed by a public utility for installation in more than one municipality for the furnishing of service, if upon a petition of the public utility, the [BPU] shall after hearing, of which any municipalities affected shall have notice, decide the proposed installation of the development in question is <u>reasonably necessary for the service, convenience or welfare of the public</u>.
>
> [N.J.S.A. 40:55D-19 (emphasis added).]

Construing the language in N.J.S.A. 40:55-50, the predecessor to N.J.S.A. 40:55D-19, the Court stated:

> 1. The statutory phrase, "for the service, convenience and welfare of the public" refers to the whole "public" served by the utility and not the limited local group benefited by the zoning ordinance.
>
> 2. The utility must show that the proposed use is reasonably, not absolutely or indispensably, necessary for public service, convenience and welfare at some location.
>
> 3. It is the "situation," i.e., the particular site or location . . . which must be found "reasonably necessary," so the [BPU] must consider the community zone plan and zoning ordinance, as well as the physical characteristics of the plot involved and the surrounding neighborhood, and the effect of the proposed use thereon.

13

4. Alternative sites or methods and their comparative advantages and disadvantages to all interests involved, including cost, must be considered in determining such reasonable necessity.

5. The [BPU's] obligation is to weigh all interests and factors in the light of the entire factual picture and adjudicate the existence or non-existence of reasonable necessity therefrom. If the balance is equal, the utility is entitled to the preference, because the legislative intent is clear that the broad public interest to be served is greater than local considerations.

[PSE&G, 35 N.J. at 376-77.]

The burden rests with the applicant to establish no alternative route has less impact on the environment or on the community. PSE&G, 35 N.J. at 368. After the petitioner establishes that showing, objectors to the petition have the burden of showing the existence of a feasible alternative site. In re Hackensack Water Co., 41 N.J. Super. 408, 426-27 (App. Div. 1956).

"When determining reasonable necessity, the [BPU] must consider alternative sites and their advantages and disadvantages, including their costs." In re S. Jersey Gas Co., 447 N.J. Super. 459, 481 (App. Div. 2016). "The [BPU] also must weigh all of the parties' interests, and where those interests are equally balanced, it must give the utility preference in light of the Legislature's clear intent that the broad public interest to be served is greater than local considerations." Ibid.

14

We are unpersuaded by Savas's argument that the NJAWC failed to satisfy the standard required under N.J.S.A. 40:55D-19.  We conclude based on our de novo review that the NJAWC established the proposed water tank is "reasonably necessary for the service, convenience or welfare of the public."

Although Savas asserts the water deficit resulting from the MCMUA contract termination can be "easily replaced"—this argument is belied by the proofs in the record.  That NJAWC has found alternative sources to fill the gap in the water supply left by the MCMUA contract termination does not resolve the issue.  The testimony at the hearing established that the additional water secured under the MCMUA contract was sourced from a higher elevation, such that the water pressure was generated through gravity alone.  The ALJ found the explanation as to why the proposed water tank is "reasonably necessary to provide safe, adequate, and reliable water services" in light of the MCMUA contract termination credible.

We "generally defer to credibility determinations made by the ALJ who had the opportunity to hear the testimony and observe the demeanor of the witnesses."  D.L. v. Bd. of Educ. of Princeton Reg'l Sch. Dist., 366 N.J. Super. 269, 273 (App. Div. 2004).  The ALJ's credibility determination coupled with the required deference to factual conclusions of administrative agencies,

A-3903-22

Capodilupo v. Bd. of Ed. of W. Orange, 218 N.J. Super. 510, 515 (App. Div. 1987), underpins our conclusion that the ALJ's decision—and the subsequent final administrative decision—were supported by adequate evidence in the record. We discern no reason to disturb the determination that NJAWC met the evidentiary standard required under N.J.S.A. 40:55D-19 to establish the proposed water tank is "reasonably necessary for the service, convenience or welfare of the public," as it is grounded in the record.

IV.

The BPU properly allocated the burden to the objectors to prove that there were reasonable alternative locations. The burden shifting analysis under N.J.S.A. 40:55D-19 controls the issue. PSE&G, 35 N.J. at 376-77. An applicant seeking an exception to the zoning ordinance or land use requirements must prove "the proposed use is reasonably, not absolutely or indispensably, necessary for public service, convenience and welfare at some location." Id. at 377. If this standard is met, the burden shifts to the objectors to show the existence of a feasible alternative. Hackensack Water Co., 41 N.J. Super. at 426-27. No suitable alternative locations were proffered.

After considering the credibility and weight of the evidence from all parties, the ALJ concluded that "[NJAWC] has met the requirements of N.J.S.A.

16

40:55D-19, proving that the [p]roposed [w]ater [t]ank is necessary for the service, convenience, and/or welfare of the public and that no alternative site or sites are reasonably available to achieve an equivalent public benefit." Once the NJAWC met this standard, the burden then shifted to Savas, as an intervening objector, to show a feasible alternative. Hackensack Water Co., 41 N.J. Super. at 426-27. Savas did not meet that burden.

Neither Savas nor the Zoning Board proffered evidence of any viable alternative proposal for meeting the water supply or evidence a suitable, alternate location for the new water tank that satisfied the needs of the community. Savas has not raised any specific details as to what factors the ALJ improperly considered in finding NJAWC met its initial burden, and we find no error in the ALJ's conclusion that

> [Savas] presented alternative methods by which NJAW[C] might have chosen to counter the loss of one million gallons of water per day from the MCMUA, none of which were deemed preferable to the decision of [NJAWC] to use its own supplies and make necessary modifications to existing infrastructure. After NJAW[C] showed that its chosen alternative would provide gravity storage, equalization volume storage for peak demands . . . and adequate pressure for fire flows, the burden was on [Savas] to show a reasonable alternative at a reasonable expense. [Savas] did not prove that any alternative method was available to [NJAWC] at a reasonable cost to the ratepayers. [Savas] did not recommend any alternative locations;

[Savas] did not so much as offer evidence in support of any of the forty-six locations identified by [NJAWC] as qualified by elevation.

We also reject Savas's contention that the ALJ did not properly weigh testimony regarding the impact of the proposed water tank on neighborhood aesthetics and property values, as unsupported by the record. The ALJ found

> as a practical matter, construction of an [eighty-three]-foot water tank anywhere in [the community] will be met with the same neighborhood opposition [NJAWC] experienced in this case. It is noteworthy that no opponent of the [p]roposed [w]ater [t]ank suggested an alternate location . . . .

The ALJ did not accept Jones's comparison of the loss in value due to having a view of the proposed replacement water tank analogous to that of a coastal home with no view of the beach as credible. We discern no error in the ALJ's findings that "[t]he [p]roposed [w]ater [t]ank has not been shown to have any adverse impact on the ambient noise levels or air quality in the neighborhood nor to result in an increase in truck or foot traffic" or "diminution of historic value of historic structures in the neighborhood" predicated on the credible evidence in the record.

V.

NJAWC presented evidence of the relative costs of alternate solutions to establish the proposed water tank on the Property was the most suitable, lowest-

cost option, contrary to the intervenor's assertion.  The proofs established that, pre-petition, the NJAWC considered forty-six alternative sites for the proposed water tank, with the ALJ finding the following as to the cost of those sites

> 1. [NJAWC] does not own any of these parcels; land-acquisition costs would be a substantial investment in utility plant that would translate to higher bills for NJAW[C] customers.  All of the parcels are located in the same general area as [Property], in which land costs are very high.
>
> 2. The new [water pumping] has been built . . . to supply water to the [community] in connection with the [p]roposed [w]ater [t]ank; no additional infrastructure will be needed to put the [p]roposed [w]ater [t]ank into service.
>
> 3. None of the alternate sites are near existing water-transmission mains, meaning that the costs of constructing new mains must be added to the total investment in utility plant.  No evidence was presented opposing Shields['s] testimony that the approximate cost would be $1,000,000 for every 1,500 feet of [water lines].
>
> 4. New rights-of-way may be required for construction and maintenance of connections between the new tank and new distribution system, potentially adding to the total investment in utility plant and potentially resulting in delays while such easements are negotiated.
>
> 5. Construction of new connections would require disruption of public streets, with police and/or other security and construction costs adding to the total investment in utility plant.

19

6. Some of the sites at adequate elevation are developed with single-family homes and there is no guarantee that the homeowners would be willing to sell. Several are in [the neighboring borough], where zoning prohibits public-utility facilities. Others are already preserved through the [land preservation] programs and are therefore unavailable.

Our governing statutes and case law do not support Savas's assertion that NJAWC should have been required to set forth the specific costs for all forty-six possible alternative sites and select only the lowest-cost option. N.J.S.A. 40:55D-19 does not mandate that the lowest-cost option must be selected. Rather, the burden on the petitioner is to consider the reasonable alternatives and make a determination based on overall feasibility and adverse impact on the community. Hackensack Water Co., 41 N.J. Super. at 428. As incorporated by the BPU's final administrative decision, the ALJ set forth set conclusion "[t]hat based upon the record, the [p]roposed [w]ater [t]ank is not adverse to the environment, the public health, and/or the public welfare."

Any other arguments raised in this appeal, to the extent we have not addressed them, are without sufficient merit to be discussed in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION