46 A.3d 560

IN THE MATTER OF THE BOARD'S MAIN EXTENSION
RULES N.J.A.C. 14:3–8.1 ET SEQ.

Superior Court of New Jersey
Appellate Division

Argued March 13, 2012—Decided June 22, 2012.

540

Before Judges CARCHMAN, FISHER and BAXTER.

*Kevin J. Coakley* argued the cause for appellant Toll Bros., Inc. in A–1626–10 (*Connell Foley, L.L.P.,* attorneys; *Mr. Coakley,* of counsel and on the briefs; *Joseph A. Villani, Jr.,* on the briefs).

*Richard P. Coe, Jr.,* argued the cause for appellant Dunhams Farm Developers, L.L.C. in A–1640–10 (*Kennedy, Wronko, Kennedy and Weir & Partners LLP,* attorneys; *E. Richard Kennedy,*

of counsel and on the briefs; *Karyn Kennedy Branco,* on the briefs).

*Barry Spindler,* appellant pro se in A–2206–10.

*Todd D. Greene* argued the cause for appellant New Jersey Builders Association in A–2227–10 (*Sterns & Weinroth, P.C.,* attorneys; *Frank J. Petrino,* of counsel and on the brief; *Mr. Greene* and *Vincent J. Paluzzi,* on the briefs).

*Geoffrey R. Gersten,* Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities in all four appeals (*Jeffrey S. Chiesa,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Mr. Gersten,* on the briefs).

*Morgan, Lewis & Bockius, L.L.P.,* attorneys for amicus curiae New Jersey Utilities Association in all four appeals (*Marc B. Lasky* and *Gregory Eisenstark,* on the briefs).

The opinion of the court was delivered by

BAXTER, J.A.D.

In this appeal, we address the question of whether, and to what extent, our 2009 opinion in *In re Centex Homes, LLC,* 411 *N.J.Super.* 244, 985 *A.*2d 649 (App.Div.2009) should have retroactive effect. In *Centex,* we invalidated as ultra vires the 2005 Board of Public Utilities (BPU or the Board) regulations known as the Main Extension Rules, *N.J.A.C.* 14:3–8.1 to –8.13. The Main Extension Rules required utility companies to pay for the extension of utility lines to new homes in designated "smart growth" areas of the State, but forced the developer or the homeowner to absorb that cost in portions of the State that were not so designated. *Centex, supra,* 411 *N.J.Super.* at 248, 985 *A.*2d 649. We deemed the Main Extension Rules an "extreme departure" from the procedures that had been extant for nearly a century, *id.* at 261, 985 *A.*2d 649, and held that BPU lacked the authority to institute such a "drastic alteration" of the prevailing statutory

scheme in the absence of legislative approval, *id.* at 267, 985 *A.*2d 649.

Despite our sweeping invalidation of the Main Extension Rules, BPU announced in its October 22, 2010 Final Decision that it would afford our *Centex* decision only pipeline retroactivity, confining the benefit of *Centex* to only the eighteen developers who had not yet completed the utility extension process or who had applied for an exemption from the Main Extension Rules. BPU denied the benefit of *Centex* to hundreds of others.

In the present appeals, which we have consolidated for purposes of disposition, appellants Toll Bros., Inc., Dunhams Farm Developers, L.L.C., the New Jersey Builders Association, and an individual homeowner, Barry Spindler, assert that BPU's refusal to grant *Centex* full retroactive effect was an error of law not entitled to our deference. We agree. Because our opinion in *Centex* did not announce a new rule of law, but instead accomplished the reinstatement of a well-accepted and well-understood century-long procedure, and because the meticulous records maintained by the regulated utilities will enable them to provide refunds to the hundreds of parties affected by the ultra vires 2005 Main Extension Rules, we reverse BPU's October 22, 2010 pipeline retroactivity decision. We remand to BPU for the adoption of a regulation establishing the procedures for granting refunds to all developers and homeowners affected by the ultra vires 2005 regulation.

## I.

Because the history of the Main Extension Rules was previously before us in *Centex, id.* at 253–60, 985 *A.*2d 649, there is no need to repeat at length either the history of the Main Extension Rules or our reasons for invalidating them, *id.* at 261–68, 985 *A.*2d 649. For present purposes, we need only summarize the portions of *Centex* that have a bearing on the retroactivity issue that is before us today.

Ever since 1911, *N.J.S.A.* 48:2–27 has conferred an obligation on BPU and its predecessor agencies to order regulated utilities to

pay for extensions of utility service to new homes if: 1) the service extension was reasonable and practicable; 2) the extension would furnish sufficient business to justify the extension; and 3) the financial condition of the utility company reasonably warranted the expenditures involved in making and operating the extension. Prior to the adoption of the Main Extension Rules in 2005, BPU regulations "specified when a regulated utility was required to provide extensions free of charge to applicants 'and when and how [the utility] may charge applicants for new extensions.'" *Centex, supra,* 411 *N.J.Super.* at 255, 985 *A.*2d 649 (quoting 36 *N.J.R.* 276(a) (January 20, 2004)) (alteration in original).

Notably, the pre–2005 rules did not incorporate environmental or land use considerations into the system of paying for service extensions. Instead, regulated utilities were required to reimburse developers and homeowners for the cost of extending utility service, and the utilities did so over time using the revenue generated from the extensions, regardless of the portion of the State in which the service extension was to be made. *See* 36 *N.J.R.* 276(a); 34 *N.J.R.* 992(a) (March 4, 2002).

All of that changed in 2005, when BPU "dramatically altered" its regulations, and for the first time, incorporated environmental and planning principles into the reimbursement scheme. *Centex, supra,* 411 *N.J.Super.* at 255, 985 *A.*2d 649. Upon the adoption of the Main Extension Rules in 2005, regulated utilities such as water, natural gas and electricity, were—for the first time in nearly a century—prohibited from paying for or financially contributing to utility extensions in portions of the State that were not designated for growth according to the New Jersey State Planning Commission State Plan Policy Map (State Plan Map), unless the applicant for the extension was able to establish that it qualified for one of the exemptions contained in *N.J.A.C.* 14:3–8.8.[1]

---

[1] The exemptions contained in *N.J.A.C.* 14:3–8.8 include: "extension[s] already in process as of March 20, 2005," *N.J.A.C.* 14:3–8.8(a)(4); projects that "will

In August 2006, Centex Homes, LLC, began developing an age-restricted community in Howell, known as Colts Neck Crossing. *Centex, supra,* 411 *N.J.Super.* at 249, 985 *A.*2d 649. In November 2006, Centex filed a petition for utility service extensions pursuant to *N.J.S.A.* 48:2–27. *Id.* at 250, 985 *A.*2d 649. Shortly thereafter, BPU issued an order rejecting Centex's petition for an extension of service for natural gas, water and electricity, finding that the Centex project was located in an area not designated for growth on the State Plan Map. *Id.* at 251, 985 *A.*2d 649. For that reason, BPU prohibited the regulated utilities from paying for, or in any way financially supporting, the extension of utility service to the Centex project. *Ibid.* Centex appealed, and on December 30, 2009, we reversed BPU's decision, invalidated the Main Extension Rules as ultra vires, and remanded the matter to BPU for further proceedings. *Id.* at 244, 249, 985 *A.*2d 649. We did not address the question of whether our opinion was entitled to any retroactive effect, and if so, whether full retroactivity, or instead more limited pipeline retroactivity, was required.

On May 3, 2010, BPU issued a public notice seeking comments regarding whether and to what extent *Centex* should be applied retroactively. BPU received comments from nineteen interested parties, including the Division of Rate Counsel, utilities, individuals, and developers. These comments ranged from completely opposing retroactive application to supporting it unconditionally, while some commenters adopted a middle ground, urging BPU to order refunds to those parties who had specifically requested a refund.

BPU considered the matter at its August 18, 2010 meeting and determined to apply limited "pipeline" retroactivity. On October 22, 2010, BPU issued its Final Decision, retroactively applying *Centex* to eighteen matters pending as of December 30, 2009—the date of the *Centex* decision. BPU ordered that refunds would be

provide a significant public good," *N.J.A.C.* 14:3–8.8(b)(1); and those that would result in "extraordinary hardship," *N.J.A.C.* 14:3–8.8(b)(2).

issued only to applicants who had sought an exemption pursuant to the Main Extension Rules, as well as to any applicant who was in the process of obtaining a service extension but had not, prior to December 30, 2009: (1) entered into an Extension Agreement; (2) paid a deposit; or (3) commenced the physical installation (not including installation of temporary service or design work) of the extension of utility service. The Board refused, however, to apply *Centex* to any other Main Extension agreements.[2]

BPU justified its refusal to give our *Centex* opinion full retroactive effect by pointing to what it claimed would be "significant economic, legal, operational and public policy concerns." As for the "economic concerns," BPU maintained that interested parties had relied upon the growth area/non-growth area distinction contained in the 2005 regulations, and that "any retroactive application would result in an increase in costs to ratepayers." BPU concluded that in all likelihood the costs paid by developers for service extensions had already been passed on to the purchaser when the property was sold; and if full retroactivity were to be ordered, the cost of service extensions that were not refundable prior to the *Centex* decision "would likely enrich the developer," who had already passed on the cost of service extension to the buyer, rather than "make [the] developer whole for expenses it incurred."

The second factor on which BPU relied in rejecting full retroactivity was "the impact of retroactive application on the administration of justice." BPU asserted that "full retroactive application" would "re-open numerous matters and private contracts [that] are long closed and on which no appeals were taken." Additionally, according to BPU, "many new cases would be created, significantly impacting the administration of justice."

---

2 On November 10, 2010, the Board held a meeting to address a comment that had been previously overlooked. That same day, the Board issued an Order reaffirming its October 22, 2010 Final Decision.

Third were the operational "practicalities" that "come into play[.]" BPU concluded that full retroactive application would generate "substantial legal, accounting and rate-making challenges with respect to . . . how previously collected deposits and contributions in aid of construction ('CIACs') would be recalculated." BPU voiced a concern that if full retroactivity were ordered, and regulated utilities were ordered to issue refunds, the ultimate consumer would pay twice for the extension of utility service— once when the developer incorporated such costs into the purchase price of the home, and a second time if the regulated utility were to be granted a rate increase to offset the costs incurred in issuing refunds. BPU also voiced concern about the potential for a significant surge in the number of requests from regulated utilities for rate increases—and the concomitant administrative burden of resolving such requests—were the regulated utilities to be ordered to issue refunds.

BPU's October 22, 2010 decision closed with the following justification of pipeline retroactivity:

> The Board seeks to move forward in a manner that accords due deference to the *Centex* holding in light of the independent business decisions made by developers, individuals and utilities as well as filed tariffs, prior Board Orders and other determinations in the service extension area. The Board also seeks to balance the interests of all parties, including ratepayers. On balance, the Board believes that any retroactive application has great potential for severe administrative problems and regulatory havoc. This would be particularly true were the Board to determine that retroactive analysis requires the re-evaluation of the refund formula.

In sum, BPU held that because of the significant concerns it had identified in its October 22, 2010 decision, pipeline retroactivity would apply, and only the eighteen parties identified in BPU's October 22, 2010 Final Decision would be entitled to the benefit of *Centex*. For those eighteen parties, the cost of utility service extension would be borne by the regulated utility regardless of the location of the subject property, applying the same criteria that existed prior to the adoption of the 2005 regulations.

On appeal, although appellants frame their arguments slightly differently, all four contend that BPU's October 22, 2010 Final Decision must be reversed because: 1) BPU misapplied the rele-

vant legal standard governing the circumstances under which a judicial decision should be afforded retroactive effect; 2) BPU accepted the unsupported claims of the regulated utilities at face value without subjecting those claims to reasonable scrutiny; 3) additional equitable factors—apart from traditional retroactivity considerations—require full retroactive application of the *Centex* opinion; 4) questions of retroactivity should be resolved by the judiciary, not by BPU; and 5) BPU failed to engage in the rulemaking procedure required by the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B-1 to -9.

## II.

"[B]ecause 'questions of law are the province of the judicial branch,' we are 'in no way bound by an agency's interpretation of a statute or its determination of a strictly legal issue[.]' " *Russo v. Bd. of Trs., Police and Firemen's Ret. Sys.*, 206 *N.J.* 14, 27, 17 *A.*3d 801 (2011) (internal citations omitted). "A court will not permit an agency's legal determination to stand if the court believes it to be error." *Ibid.* (citation and internal quotation marks omitted). "Like all matters of law, we apply de novo review to an agency's interpretation of a statute or case law." *Ibid.* Because the present appeal involves a " 'strictly legal issue,' " the applicable standard of review is de novo. *Ibid.* (citation omitted). We owe no deference to the retroactivity decision issued by BPU.

As a general rule, judicial decisions in the civil context should apply retroactively. *Selective Ins. Co. of Am. v. Rothman*, 208 *N.J.* 580, 587, 34 *A.*3d 769 (2012); *Reuter v. Borough Council of Fort Lee*, 167 *N.J.* 38, 42, 768 *A.*2d 769 (2001); *Crespo v. Stapf*, 128 *N.J.* 351, 367, 608 *A.*2d 241 (1992). The presumption in favor of retroactivity can be overcome only by a clear showing of sound policy reasons for limiting the retroactive effect of a judicial decision. The narrow circumstances when we will depart from the presumption in favor of retroactive application, and will apply a judicial mandate only prospectively, include situations when "(1)

the decision establishes a new rule of law, by either overruling past precedent or deciding an issue of first impression, and (2) when retroactive application could produce substantial inequitable results." *Velez v. City of Jersey City*, 180 *N.J.* 284, 297, 850 *A.*2d 1238 (2004).

A ruling that applies settled principles, and that does not announce a new rule of law, will be given retroactive application. *Stafford v. Stafford Twp. Zoning Bd. of Adj.*, 154 *N.J.* 62, 74, 711 *A.*2d 282 (1998). A new rule of law is one that "overrul[es] past precedent or decid[es] an issue of first impression." *Malinowski v. Jacobs*, 189 *N.J.* 345, 352, 915 *A.*2d 513 (2007).

Only when the rule at issue constitutes a new rule of law, will a court proceed to determine whether the new rule should be applied prospectively or retroactively. *Stafford, supra,* 154 *N.J.* at 74, 711 *A.*2d 282. When a judicial decision announces a new rule of law, our decision concerning the extent of any retroactivity focuses on the following factors: 1) the purpose of the rule and whether it would be furthered by a retroactive application; 2) the degree of reliance placed on the old rule by those who administered it; and 3) the effect a retroactive administration would have on the administration of justice. *Ibid.* (citation and internal quotation marks omitted).

The Court has identified four options for implementing a new rule of law:

(1) make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying the old rule to all other pending and past litigation; (3) grant the new rule limited retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties have not yet exhausted all avenues of direct review; and finally, (4) give the new rule complete retroactive effect, applying it to all cases, even those where final judgments have been entered and all avenues of direct review exhausted. [*Fischer v. Canario,* 143 *N.J.* 235, 244, 670 *A.*2d 516 (1996) (citation omitted).]

More recently, although in the criminal context, the Court has described these four options "[i]n descending order [based upon] the breadth of their effect, from the most narrow to the broadest,"

providing a shorthand hierarchy that is structured in the following terms: "purely prospective," "prospective," "pipeline retroactivity," and "full retroactivity." *State v. Dock,* 205 *N.J.* 237, 258, 15 *A.*3d 1 (2011).

In the first category, application of the judicial decision is "purely prospective, ... applying ... only to cases in which the operative facts arise after the new rule has been announced." *Id.* at 256, 258, 15 *A.*3d 1 (citation omitted). Second, application may be "prospective, ... applying the new rule in future cases and in the case in which the new rule is announced, but not in any other litigation that is pending or has reached a final judgment at the time the rule is set forth." *Id.* at 258, 15 *A.*3d 1 (citation and internal quotation marks omitted). The third option is to "give the new rule 'pipeline retroactivity,' rendering it applicable in all future cases, the case in which the rule is announced, and any cases still on direct appeal." *Id.* at 256, 15 *A.*3d 1 (citation omitted). Finally, the broadest option is "full retroactivity," which applies the new rule to "all cases, including those in which final judgments have been entered and all other avenues of appeal have been exhausted." *Id.* at 256, 258, 15 *A.*3d 1 (citation omitted).

The first of several grounds on which appellants attack the Board's 2005 pipeline retroactivity regulation is that the *Centex* decision did not announce a new rule of law. For retroactivity purposes, a judicial opinion announces a new rule of law only if there is a " 'sudden and generally unanticipated repudiation of a long-standing practice.' " *State v. Purnell,* 161 *N.J.* 44, 53, 735 *A.*2d 513 (1999) (quoting *State v. Afanador,* 151 *N.J.* 41, 58, 697 *A.*2d 529 (1997)). That is, there must be some "appreciable past from which the [new] rule departs." *Ibid.* (citation and internal quotation marks omitted). A rule of law is not "new," and "no issue of retroactive application even exists," where the rule "represents either established law or a principle plainly hovering on the horizon." *Williams v. Bell Tel. Labs.,* 132 *N.J.* 109, 123, 623 *A.*2d 234 (1993).

"[W]here a new rule is not at issue, a retroactivity inquiry is unnecessary." *State v. Feal,* 194 *N.J.* 293, 308, 944 *A.2d* 599 (2008). "Courts will simply construe the rule as 'one that has always applied.'" *Ibid.* (citation omitted).

Contrary to the Board's assertions, our decision in *Centex* did not constitute a "new rule of law." As we have noted, we held in *Centex* that the Main Extension Rules constituted "an extreme departure" from existing law. *Centex, supra,* 411 *N.J.Super.* at 261–62, 985 *A.2d* 649. Ever since 1911, *N.J.S.A.* 48:2–27 has conferred a duty on the Board to order utilities[3] to pay for extensions of service if 1) the extension is reasonable and practicable, 2) the extension will furnish sufficient business to justify the extension, and 3) the financial condition of the utility reasonably warrants the expenditures involved in making and operating the extension. *See id.* at 255, 985 *A.2d* 649. Under the Board's pre-2005 rules governing main extensions, which were in effect for decades, public utilities reimbursed developers the cost of extending extensions of utility service over time using revenue generated from the extensions, regardless of the location of the extension. *See* 36 *N.J.R.* 276(a); 34 *N.J.R.* 992(a).

The 2005 Main Extension Rules were ultra vires, were partially in effect for less than five years (2005 to 2009), and were fully in effect for only three years[4] before they were invalidated. *See Centex, supra,* 411 *N.J.Super.* at 247, 249, 257, 985 *A.2d* 649. This four-year hiatus—from 2005 to 2009—does not constitute an appreciable break from nearly a century of law requiring public utilities to reimburse applicants for the costs of financially viable extensions of utility service, regardless of the location of the extension. As we noted in *Centex,* "[t]he statutory law governing service extensions embodied in *N.J.S.A.* 48:2–27 was enacted in

---

[3] The utilities in question have included water, gas, electric and telephone companies.

[4] The Main Extension Rules were not fully phased in until January 1, 2007. *Centex, supra,* 411 *N.J.Super.* at 257–58, 985 *A.2d* 649.

1911," and "the language in the original 1911 session law is nearly identical to the version of *N.J.S.A.* 48:2–27 currently in effect[.]" *See Centex, supra,* 411 *N.J.Super.* at 262, 985 *A.*2d 649.

Although the filing of our *Centex* decision in late 2009 was a definitive statement of the invalidity of the Main Extension Rules, it was far from the first clarion call. The Rules were under attack before, and soon after, their promulgation. *See* 36 *N.J.R.* 5928(a) (Dec. 20, 2004). In light of the phase-in period, which lasted until January 2007, we agree with appellants' contention that the Main Extension Rules had hardly taken effect when they were set aside in the *Centex* decision. *See N.J.A.C.* 14:3–8.6, –8.8. We hold that because the 2005 Main Extension Rules were in effect for a very brief period of time, because the Rules were under attack from the outset, and because we invalidated the 2005 Main Extension Rules, there was no "new rule of law" to which retroactivity could be applied.

In so concluding, we reject BPU's assertion that our ruling in *Centex* was a new rule in relation to the 2005 Main Extension Rules. BPU argues that in *Centex* we recognized that the Main Extension Rules promulgated by BPU in 2005 were substantially different from the pre–2005 rules, *Centex, supra,* 411 *N.J.Super.* at 266–67, 985 *A.*2d 649, such that the reinstated pre–2005 rules would be new in relation to the preceding rules that we invalidated. BPU further maintains that appellants relied on the 2005 Main Extension Rules in paying the costs of extensions for their projects, and other parties benefited from the modified refund formulas in growth areas. Amicus New Jersey Utilities Association advances a similar claim, contending that *Centex* articulated a new rule of law because the regulation that we reinstated had not been applied in the five years that preceded the decision.

These arguments lack merit. The undeniable fact is this: the only reason the *Centex* decision was even necessary is because BPU promulgated a regulation that was void from its inception. A judicial decision that restores the regulatory scheme to that required by the governing statute—and which reinstates a reim-

bursement scheme that had existed for ninety-four of the last ninety-eight years—cannot be deemed a new rule of law. Such a judicial decision is not the "sudden and generally unanticipated *repudiation* of a long-standing practice." *Purnell, supra,* 161 *N.J.* at 53, 735 *A.*2d 513 (emphasis added) (citation and internal quotation marks omitted). It is the opposite, namely, the *restoration* of a long-standing practice. So viewed, *Centex* did not announce a new rule of law. Because BPU's 2005 Main Extension Rules were never valid, our statement of the law was not new, but was rather an application of a well-accepted and well-understood principle: a regulation that deviates from the very statute it purports to implement—here *N.J.S.A.* 48:2–27, which provisions are mandatory—will be struck down. *Bd. of Fire Comm'rs of Fire Dist. No. 3, Piscataway v. Elizabethtown Water Co.,* 27 *N.J.* 192, 200, 142 *A.*2d 85 (1958).

Because *Centex* is not a new rule of law, it is fully retroactive without any further inquiry. *See Feal, supra,* 194 *N.J.* at 308, 944 *A.*2d 599. For that reason, we invalidate the Board's October 22, 2010 Final Decision that applied *Centex* retroactively only to the eighteen matters that were pending on December 30, 2009, the date of the *Centex* decision. Such pipeline retroactivity represents an unwarranted constriction of the proper reach of our *Centex* decision.

Indeed, affording the *Centex* decision complete retroactive effect—by applying it to all cases, even those in which developers or homeowners in non-smart growth areas have already paid for the extension of utility service—is the only way to rectify the inequity created by the invalidated Main Extension Rules. *See Crespo, supra,* 128 *N.J.* at 371, 608 *A.*2d 241 (finding that retroactive application of the Court's decision was the only way to eliminate the unconstitutional commerce clause violation caused by the tolling statute at issue, and ensure equal treatment of those affected by the invalidated statute).

As a consequence of BPU's pipeline retroactivity decision, only eighteen of the hundreds of parties affected by the invalid regula-

tion [5] will reap the benefit of *Centex*. Granting the *Centex* decision anything less than full retroactivity would deprive the vast majority of affected parties, namely, non-exempt parties who started projects after March 2005, did not have written commitments from utilities to pay for utility service to their projects, and paid for extensions of service but did not receive reimbursement from utilities, of any remedy and would circumvent the holding of *Centex*.

We agree with appellants' observation that many parties affected by the invalid Main Extension Rules cannot meet BPU's pipeline retroactivity threshold through no fault of their own, and for that reason, denying them the benefit of complete retroactivity of our *Centex* decision would cause an inequitable result. Specifically, BPU's October 22, 2010 order giving *Centex* pipeline retroactivity confined the benefit of *Centex* to applicants who had sought an exemption from the Extension Rules, as well as to any applicant who was in the process of obtaining an extension of service but had not, prior to December 30, 2009 (1) entered into a Main Extension Agreement; (2) paid a deposit; or (3) commenced physical installation of the service extension.

---

[5] The record does not contain precise information about the number of parties affected by the invalid 2005 Main Extension Rules. However, when South Jersey Gas Company (SJGC) submitted comments to BPU on May 27, 2010 concerning the potential retroactive impact of the *Centex* decision, it commented that during the 2005–09 time period when the Main Extension Rules were in effect, SJGC entered into "approximately 500" main extension agreements that required "some form of customer payment." Of those 500, "approximately 440" were executed in non-smart growth areas, which means that, at a minimum, there are 440 parties who have been adversely affected by the Main Extension Rules we invalidated in *Centex*.

We recognize that SJGC provides natural gas service in only the southern part of the State, much of which is comprised of non-smart growth areas, as defined in the State Plan. But there are non-smart growth areas in the northwest part of the State as well, and no utility company from that part of the State has submitted data comparable to the data submitted by SJGC. As a result, the figure of 440 is, in all likelihood, an undercount of the parties who would reap the benefit of *Centex* if full retroactivity were applied.

But some developers, who would otherwise have satisfied BPU's pipeline retroactivity threshold, were unable to do so because, for example, they were involved in litigation that so delayed the construction of their projects that they were not yet in a position to seek an exemption from the Main Extension Rules. Other developers suffered from the opposite problem: because many developers had already made considerable progress toward completion of their non smart-growth area projects at the time the Main Extension Rules were adopted in March 2005, those developers were unwilling to essentially "freeze" their projects and await resolution of a challenge to the validity of the Main Extension Rules, and they paid for the service extension under protest. Many individual homeowners did so as well. But by so proceeding, they ran afoul of BPU's later pipeline retroactivity standard because those developers, or individual homeowners, had already entered into a Main Extension Agreement and had commenced physical installation of the service extension. These serendipitous circumstances—which disqualified them from reaping the benefit of *Centex*—are arbitrary in their reach, and serve to underscore the inherent unfairness of pipeline retroactivity here.

The denial of reimbursement to appellant Toll Bros. as a result of BPU's 2005 Extension Rules is but one example of the impact of BPU's October 2010 pipeline retroactivity decision. Because Toll Bros.'s Mount Olive residential development and other Toll Bros. projects were situated in non-smart growth areas, the company was left with no alternative but to pay for utility extensions—without receiving any reimbursement—and made such payments "under protest." Because of the combined impact of the invalid Main Extension Rules, and BPU's October 2010 decision affording only pipeline retroactivity to *Centex*, Toll Bros. has been denied reimbursement of more than $2,220,000 in utility extension costs for various projects constructed throughout the State.

The impact on appellant Dunhams Farm has been similar. Because its residential subdivision in South Brunswick was located in an area that was not designated for growth under the Smart

Growth Rules, and because Dunhams Farm's request for reimbursement did not satisfy the pipeline retroactivity conditions established by BPU in its October 2010 order, Dunhams Farm has been denied reimbursement of $228,103, consisting of $112,183.87 paid to JCP & L, $69,180.99 paid to PSE & G, and $46,139.56 paid to Verizon.

The impact on Barry Spindler, an individual homeowner, has been significant as well. When he and his wife constructed their home, they paid $18,234 for line extension fees to bring electric and telephone service to their new home, but were denied reimbursement of those costs because their new home in Stow Creek Township was situated in a non-smart growth area. And because the Spindlers obtained permits for the line extensions before the 2005 Main Extension Rules took effect, and their request for an exemption was no longer pending at the time *Centex* was decided, they did not satisfy BPU's pipeline retroactivity criteria even though they were denied reimbursement of the $18,234 because the line extensions were installed at a time when the Main Extension Rules were in effect.

Failing to give *Centex* full retroactive application effectively gives continued vitality to regulations that this court described as an "extreme departure" from nearly 100 years of precedent, *see Centex, supra,* 411 *N.J.Super.* at 262, 985 *A.*2d 649, and declared ultra vires, *id.* at 249, 985 *A.*2d 649. To the extent that the Board's ultra vires practices continue after *Centex,* pipeline retroactivity improperly constricts the reach of that opinion.

Neither of the opinions the Board cites in favor of pipeline retroactivity deals with the situation here: namely, an administrative agency deciding to afford a judicial opinion pipeline retroactivity. The cases cited by BPU are distinguishable on that basis, as neither one addresses an administrative agency's decision to afford a judicial decision limited retroactivity. *See Pub. Serv. Elec. & Gas Co. v. N.J. Dep't of Envtl. Prot.,* 101 *N.J.* 95, 101, 113, 501 *A.*2d 125 (1985) (affording prospective application to the invalidation of the permit fees issued by the Department, reasoning that

the fees had been in effect "for a number of years"); *Pascucci v. Vagott,* 71 *N.J.* 40, 50, 362 *A.*2d 566 (1976) (ordering prospective application after striking down a regulation as in conflict with the statute the regulation purported to implement).

## III.

A number of other factors support our conclusion that *Centex* should be afforded complete retroactivity. First, neither BPU nor the regulated utilities reasonably relied on the Main Extension Rules we invalidated in *Centex.* In determining whether or not to apply a judicial decision retroactively, a court must consider the degree of reliance placed on the old rule by those who administered it. *Stafford, supra,* 154 *N.J.* at 74, 711 *A.*2d 282. "[A] party seeking to avoid retrospective application of a decision must show *actual* reliance on a contrary principle of law." *N.J. Election Law Enforcement Comm'n v. Citizens to Make Mayor–Council Government Work,* 107 *N.J.* 380, 393, 526 *A.*2d 1069 (1987) (citations omitted) (emphasis in original). *See also Coons v. Am. Honda Motor Co.,* 96 *N.J.* 419, 427–28, 476 *A.*2d 763 (1984) (observing that "reliance interests weigh heavily in the shaping of appropriate equitable relief") (citing *Lemon v. Kurtzman,* 411 *U.S.* 192, 203, 93 *S.Ct.* 1463, 1471, 36 *L.Ed.*2d 151, 163 (1973)).

In its October 2010 Final Decision, the Board asserted that "utilities have indicated that they relied on these rules[.]" The Board noted that utilities, developers and homeowners relied on the existence of the designated growth/non-designated growth distinction in various ways. According to the Board, the regulated community considered the regulations not only in planning related service extensions but also in addressing income obligations and in setting utility rates. The Board maintained that undoing this process would be "cumbersome, time-consuming and costly," with one utility reporting that 3000 extension files would need to be reviewed.

In urging us to uphold its pipeline retroactivity order, the Board also notes that a developer would ordinarily incorporate the

expense relating to an extension into the selling price. *See Deerfield Estates, Inc. v. Twp. of E. Brunswick*, 60 *N.J.* 115, 132, 286 *A.*2d 498 (1972) (recognizing, in a case regarding extension of water mains by a municipal utilities authority, that developers "normally" impose costs relating to the extension of water mains upon purchasers in fixing the selling price). *See also S. S. & O. Corp. v. Twp. of Bernards Sewerage Auth.*, 62 *N.J.* 369, 385–86, 301 *A.*2d 738 (1973) (noting that "there should ... be a determination as to whether any portion [of the charges] was passed on to the purchasers ... and if so, ... then the moneys for which the purchasers should be reimbursed shall be placed in trust").

Finally, the Board maintains that the Main Extension Rules were part of a regulatory landscape comprised of regulations issued by the Pinelands Commission, the Department of Environmental Protection and the Highlands Commission. The Board argues that *Centex* changed the regulatory landscape in numerous ways, impacting utilities' operations and tariffs and developers' cost assumptions in the selection of developable property. The Board claims that complete retroactivity would further complicate the calculation of money to be reimbursed.

Appellants dismiss these claims as unsupported by the record and assert that, in the words of Toll Bros., "utilities have traditionally ordered their affairs, both financially and administratively, taking into account the requirement that they reimburse those who paid for utility extensions the cost of constructing financially viable service extensions." For that reason, providing refunds should not be a significant burden. *Cf. Rutherford Educ. Ass'n v. Bd. of Educ. of Rutherford*, 99 *N.J.* 8, 28, 489 *A.*2d 1148 (1985) (limiting retroactivity out of concern for the serious adverse financial effect retroactive application would have on the boards of education as well as potentially "serious consequences on the tax structure of many communities and other community services"); *SASCO 1997 NI, LLC v. Zudkewich*, 166 *N.J.* 579, 594, 767 *A.*2d 469 (2001) (observing that "retroactive application would likely

preclude creditors from recovery in a substantial number of cases, greatly prejudicing ... the entire commercial lending industry").

Unlike in *SASCO* and *Rutherford,* the utilities' reliance costs here are primarily administrative. While the utilities will be required to reimburse those affected by the 2005 regulations, the utilities will likely have the capacity to seek to recoup most, or all, of those costs in future rate setting proceedings before BPU.

The reliance analysis must consider not only whether there was actual reliance but also whether that reliance was reasonable. In support of the argument that any reliance was not reasonable, appellants note that the 2005 Main Extension Rules were fully phased-in for only three years and were subject to almost immediate legal attack. The threat of litigation challenging a given regulation would not be sufficient, standing alone, to establish that the Board's reliance was unreasonable because regulations are challenged as a matter of course. *Cf. SASCO, supra,* 166 *N.J.* at 594, 767 *A.*2d 469 (finding that retroactive application would be inequitable because the party reasonably relied on a practice apparently dominant throughout the industry); *Mirza v. Filmore Corp.,* 92 *N.J.* 390, 399 n. 4, 456 *A.*2d 518 (1983) (stating that reliance on an old rule was "dubious" due to the outcome of several New Jersey Supreme Court opinions).

However, the threat of litigation, which served as some indication that reliance on the new rule was unjustified, combined with the fact that the regulation was in effect for less than five years before the Board was forced by *Centex* to return to a rule that had been in effect for nearly a century, suggest that any reliance by the Board and developers on the new rule was not reasonable.

■ Second, we conclude that BPU has overstated the administrative burden that would result from full retroactivity. As a threshold matter, we agree with BPU that as a general rule, decisions concerning the extent of retroactivity should take into account the administrative burdens occasioned by full retroactivity. *Pub. Serv. Elec. & Gas, supra,* 101 *N.J.* at 112–14, 501 *A.*2d

125 (upholding limited retroactive application of the Court's decision to issue a credit only to the parties in the matter out of recognition "that there are sound policy reasons for not disturbing entirely the pattern of governmental activities established under a regulatory scheme that has been in place for a number of years"); *Rutherford, supra*, 99 *N.J.* at 28, 489 *A.*2d 1148 (recognizing that "financial impact upon persons who relied on past law is a sufficient reason to apply the law prospectively"); *Tomarchio v. Twp. of Greenwich*, 75 *N.J.* 62, 78, 379 *A.*2d 848 (1977) (applying only prospective relief in order to avoid any possible confusion in the administration of the statute); *Borough of Neptune City v. Borough of Avon–by–the–Sea*, 61 *N.J.* 296, 311, 294 *A.*2d 47 (1972) (noting that "[t]o attempt now to turn the clock back to the non-discriminatory schedule (with considerably lower charges) specified in the pre-amendment ordinance would only create hopeless practical confusion and some unfairness to the municipality"); *Smith v. Hudson Cnty. Register*, 411 *N.J.Super.* 538, 571–72, 988 *A.*2d 114 (App.Div.2010) (noting fiscal impact considerations and good faith reliance in applying the case prospectively).

More recently, in *Henderson v. Camden County Municipal Utility Authority*, 176 *N.J.* 554, 562, 826 *A.*2d 615 (2003), the Court recognized that requiring the Camden County Municipal Utilities Authority to review quarterly invoices of 150,000 customers over nine years would create "substantial inequitable results." The Court further noted that "retroactive application of [its] decision likely would cause other utility authorities throughout the state to incur considerable expense and administrative hardship in the process of computing and issuing potential refunds." *Ibid.* In light of the expense and administrative hardship, the Court declined to order refunds of overpaid funds. *Id.* at 563, 826 *A.*2d 615.

The Board argues that full retroactivity would require that closed matters and contracts in which no appeals were sought be reopened. The Board further contends that recovery of costs by the utilities will be complicated by the fact that numerous utilities

have obtained rate increases in the intervening period, establishing rates based on certain presumptions, including the growth/non-growth distinction in the Main Extension Rules. *See generally In re Petition of Pivotal Util. Holdings Inc.,* BPU Docket No. GR09030195 (December 17, 2009). The Board asserts that it would need to work with all of the utilities, either individually or collectively, to develop an appropriate rate base adjustment or other recovery mechanism to allow for the appropriate accounting of these facilities and to allow recovery of the revenue requirements associated with any rate base adjustment.

Appellants respond that the Board's claims about administrative burdens are not supported by evidence in the record. In particular, Toll Bros. points out that the refund process after *Centex* created little administrative burden, although we note that *Centex* involved a single entity that had challenged the regulation. The number of affected parties here is not insubstantial, but would not approach the magnitude of the proposed reimbursement plan in *Henderson,* which would have involved 150,000 customers in a nine-year time span.

While the utilities will be required to review at least 440 [6] closed files to evaluate the requests for reimbursement, we do not view this as an insurmountable problem. We referred earlier in this opinion to SJGC citing 440 customers who were affected by the 2005 Main Extension Rules, and who would potentially be entitled to reimbursement if complete retroactivity were to be required. We realize that developers and homeowners have also acquired line extensions for electricity, water and telephone service, but because any customer seeking gas service would also need electricity, water and telephone service, we believe the universe of customers served by SJGC would be the same customers served by the other utility companies in the geographic area covered by SJGC. As a result, there would be a total of 440 customers seeking reimbursement from any one utility company in the part of the

---

[6] *See* n. 5, *supra.*

State served by SJGC. We have been provided with no information about the number of reimbursement requests that would be generated in the other non-smart growth areas of the State. In any event, the total number of such requests pales in relation to *Henderson.*

Additionally, not all utility companies are opposed to full retroactivity. Specifically, New Jersey Natural Gas Company (NJNG) notified BPU during the public comment period that it would have no objection to complete retroactivity, and anticipated being able to handle any administrative burden that might result from complete retroactivity. In its May 28, 2010 formal comment, NJNG stated:

> NJNG appreciates that the [Board] is seeking public input on the issues being addressed in this proceeding as it analyzes the impacts of the Appellate Division ruling in ... [the *Centex* decision]. . . .
>
> NJNG proposes that *all requests* for main extensions that were submitted to NJNG during the March 2005 through December 2009 time frame at issue (the "time period") have the opportunity to be addressed in the same manner. . . .
>
> . . . .
>
> [T]o provide a fair, consistent and workable response to the findings in the Centex Decision, NJNG suggests that applicants in non-growth areas who submitted requests for main-extensions between March 2005 and December 2009 can contact the respective utilities to have their deposit amounts recalculated as if the subject property were located in a growth area, pursuant to N.J.A.C. 14:3–8.7. . . .
>
> [ (Emphasis added).]

Moreover, utilities keep meticulous records; the utilities are required to keep records of revenue for ten years after the connection of an extension. *N.J.A.C.* 14:3–8.9. Furthermore, the refund applications would be processed in the same manner as the eighteen that have already been processed pursuant to pipeline retroactivity. Although some administrative burden would result from full retroactivity, the fact remains that merely administrative interests are at stake, weighed against the judiciary's interest in the effectuation of the *Centex* ruling as well as the appellants' interest in receiving the benefit of *Centex.* We reject BPU's finding that administrative burdens justify pipeline retroactivity and entitle BPU to deny complete retroactivity.

## IV.

We turn now to the mechanism for implementing the complete retroactivity that we have now required. BPU must propose and adopt a rule in compliance with all rulemaking requirements of the APA. At a minimum, the proposed rule should address the following topics: 1) the timing of the submission of refund requests; 2) the procedures for submitting a refund request to a utility; 3) the maximum number of years during which the utility will be permitted to incrementally refund the full cost of the service extension; and 4) the method of calculating the reimbursement rate, e.g., five times the estimated first year revenue derived from the connection, or ten times the estimated first year revenue, with subsequent payments continuing until the entire deposit is repaid.[7] We intimate no view on whether a "five times" or "ten times" factor should be proposed by BPU, except to note that we would anticipate that the same procedures would be proposed by BPU in the rulemaking process as have already been applied for the eighteen parties who obtained refunds pursuant to BPU's pipeline retroactivity order.

BPU may also consider whether the proposed rule should include a mechanism for determining whether a developer has already passed on the cost of the service extension to the homeowner by increasing the cost of the home in a commensurate

---

[7] BPU's pre–2005 Main Extension regulations generally required utilities to refund the extension deposit to the applicant as connections to the extension became active, at a rate of five times the estimated first year revenue derived from the connection, with subsequent payments continuing for up to ten years, until the entire deposit amount was repaid. 34 *N.J.R.* 992(a). The reimbursement formula contained in the Main Extension Rules provided for an accelerated reimbursement rate equal to ten times the estimated first year revenue from the service connection in so called "smart growth" areas, but allowed no reimbursement in non-smart growth areas. *N.J.A.C.* 14:3–8.9, 8.10. The Main Extension Rules authorized reimbursement from connections made within ten years from the date when the customer first receives service. *N.J.A.C.* 14:3–8.9. The pre–2005 iteration of the Main Extension Rules instead authorized reimbursement for connections made within ten years from the date of the original deposit. 34 *N.J.R.* 992(a).

amount, and, if so, the consequences of having done so. Because the contours of any such provision have not been briefed by the parties, we proceed no further on this latter topic.

Reversed and remanded.